## A. W. GREGG v. DELHI-TAYLOR OIL CORPORATION

No. A-7977. Decided February 22, 1961
Rehearing overruled April 5, 1961
(344 S. W. 2d Series 411)

*William Darden,* of Corpus Christi, *Tom G. Oliver, Jr.,* and *Ernest Morgan,* of San Marcos, *Ewers, Toothaker, Ewers, Elick, Jones & Abbott, William E. York,* of McAllen, and *Hart and Hart,* of Austin, for petitioners.

*Charles E. Thompson,* of McAllen, *Turner, White, Atwood, Meer & Francis* and *C. Sidney McClain, Jackson, Walker, Winstead, Cantwell & Miller,* of Dallas, *Frankin W. Dennis, Looney, Clark, Matthews, Thomas & Harris,* of Austin, for respondents.

MR. JUSTICE GREENHILL delivered the the opinion of the Court.

A. W. Gregg is the owner of an oil and gas lease on .42 acres in the City of Pharr, Hidalgo Colnty, Texas. The tract is approximately 75 feet wide. Delhi-Taylor Oil Corporation and Mayfair Minerals, Inc., (herein called Delhi-Taylor) own the mineral estates in lands surrounding Gregg's lease. Gregg is drilling a well 37-½ feet from Delhi-Taylor's lease on the east and 80 feet from its south line. He plans to increase the productivity of his well by fracturing the gas-producing formation, a process by which sand is mixed with liquid and forced into the structure under great hydraulic pressure. Veins or cracks are thus opened so that the gas may flow from the producing rock or sand into Gregg's well. Delhi-Taylor brought this suit to enjoin Gregg from fracturing the common formation beyond Gregg's own property lines and into Delhi-Taylor's lease. It is a suit by Delhi-Taylor to enjoin a subsurface trespass by Gregg.

The case was transferred to Hays County for trial. There Gregg pleaded that the District Court was without jurisdiction to try the case. It was and is Gregg's contention that the matter must first be heard and determined by the Railroad Commission of Texas. His theory is that this administrative body has "primary jurisdiction"; that the holding of that body may then be appealed to a District Court in Travis County and there tested by the substantial evidence rule.

Without hearing evidence, the District Court agreed with Gregg, and Delhi-Taylor's case was dismissed. That action was reversed by the Court of Civil Appeals in Austin. It ordered that the case be reinstated for trial in the District Court. 337 S. W. 2d 216. It made a similar holding in a related case.[1] On the same day, the Court of Civil Appeals at San Antonio reached the opposite result in a similar case, one justice dissenting.[2] We granted applications for writs of error in all three cases. We here affirm the judgment of the Austin Court of Civil Appeals.

The question here is whether the courts of Texas have and will exercise the power to grant injunctive relief to preserve

1. Delhi-Taylor v. Gregg, Texas Civ. App., 337 S.W. 2d 222, in which writ was also granted. It is decided also this date by this Court. [post p. 38, 344 S.W. 2d 419].

2. Holmes v. Delhi-Taylor Oil Corporation, Texas Civ. App., 337 S.W. 2d 479, also decided this date. [post p. 39, 344 S.W. 2d 420].

the status quo upon allegations and proof that a neighbor is about to fracture an oil or gas producing horizon beyond his property lines for the purpose of increasing the productivity of the neighbor's well. More broadly, the question is whether the courts have the power to determine whether a subsurface trespass is occurring or is about to occur, or whether the Railroad Commission has this power to the exclusion of the courts, with the courts having the power only to review, under the substantial evidence rule, or otherwise, the action of the Commission.

It is the contention of Gregg and his counsel that the Legislature has delegated to the Commission general powers to regulate the oil and gas industry; that the Legislature has said that the Commission "shall make and enforce" rules and regulations to prevent waste and to protect correlative rights; and that more particularly, the Commission has the power and duty to supervise the drilling and completion of wells (with the further contention that sand fracturing is part of the completion process); that the Commission has the duty to establish rules "for shooting wells" and "to require wells to be drilled and operated in such a manner as to prevent injury to adjoining property."[3] Gregg points out that the Legisature has authorized the Commission to institute suits, to hear and determine complaints, to sue out such writs and processes as may be necessary to enforce its orders, and to punish for contempt or disobedience of its orders.[4]

■ Gregg and his counsel rely heavily upon the theory of "primary jurisdiction." That theory is that when the Legislature has delegated the power to an administrative body to regulate a particular industry or business, the courts may not or will not interfere until the board or bureau has had an opportunity to pass upon the matter and has remedied, or attempted to remedy, the situation. Two of the main arguments supporting this theory are: (1) That the commission, board or bureau is staffed with experts trained in the handling of the complex problems presented, and (2) great benefit is to be derived from a uniform interpretation of laws, rules and regulations by an administrative body whereas different results might be reached under simi-

3. See Articles 6004 to 6049e of Vernon's Texas Civil Statutes Annotated, and in particular Article 6008, §§ 6, 8, 12. See also Article 6014, 6024, and 6029, particularly §§ 2 and 6. Statutes referred to are from Vernon's compilation mentioned.

4. Article 6024. The validity of this statute or any of the other statutes is not here questioned or passed upon.

lar fact situations by various courts or juries.[5] It is their position that "primary jurisdiction" is a principle which determines whether the court or the administrative body should make the initial decision. And this is a case, they say, in which the initial decision should be (must be) made first by the Commission.

5. Compare Texas and Pacific Ry. Co. v. Abilene Cotton Oil Company, 1907; 204 U. S. 426; and see Justice Brandeis' statement of the rationale of the rule in Great Northern Ry. Co. v. Merchants' Elevator Co. (suit to recover for overcharging of interstate shipping tariff), 259 U. S. 285 at 291, 42 Sup. Ct. 477, 66 L. Ed 943, where he says resort must first be had to the Commission "because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts."

See also 1 Vom Bauer, *Federal Administrative Law* 191, § 214, The Primary Jurisdiction Doctrine: "A court does not have jurisdiction to determine administrative questions, or to adjudicate controversies involving them until they have been determined by the appropriate administrative agency."

The doctrine is further explored in note, 51 Harvard L. Rev. 1251 (1938), and in an article by K. C. Davis, "Administrative Law Doctrines of Exhaustion of Remedies, Ripeness for Review, and Primary Jurisdiction," 28 Texas L. Rev. 376 at 400 et seq. It is Davis' view that "the principal criterion in deciding whether the doctrine is applicable usually is not legislative intent but usually is judicial appraisal of need or lack of need for resort to administrative judgment." Davis, 3 *Administrative Law Treatise* (1958), 53 § 19.09.

There are good arguments that the rule of "primary jurisdiction" has been carried at least far enough, particularly where the question is essentially judicial in nature. Reviewing the subject of "Primary Jurisdiction: The Rule and Its Rationalizations," the writer in 65 Yale Law Journal 313 says at pages 329 et seq.: "The trouble is that if the primary jurisdiction rule is to apply whenever there is an expert adjudicating body available, then the rule must have unlimited applicability in the regulated industries. Logically, this leaves the courts no jurisdiction in that area at all * * * Indeed, it is difficult to name a single branch of litigation in which at least a substantial proportion of the cases do not turn upon technical questions of finance, accounting, engineering, medicine, manufacturing methods * * * and the like * * *. Whether adjudication by experts is desirable is not the question. Much can be said for it. But it cannot be achieved without sacrificing other things for which much can likewise be said. To mention one, trial by expert and trial by jury are mutually exclusive." Id. 330. "The rule cries for a sensible touchstone of applicability—one that will pay the price for forfeiture of judical jurisdiction only when that price has clearly been contemplated by Congress." Id. 336.

Expansion of the doctrine is also considered and criticized by Professor Schwartz of the Pennsylvania Law School on abdication of judicial responsibility in 67 Harvard L. Rev. 436, at 471: "Expertness has been oversold in this country. The obvious and enormous success of specialization in industry and the physical sciences has led to the notion that specialization holds the answer to all questions in politics, education, philosophy, and the social sciences generally. Also we live in the shadow of an indistinctly remembered era prior to 1936 when the prestige of the judiciary had been undetermined by a series of decisions invalidating popular social legislation on dubious constitutional grounds * * *. Administrative expertise is a slogan which served well in a period of struggle to establish some degree of authority for the emerging new tribunals. Perhaps the time has come for a re-examination of the content of this slogan." Id. 473.

See also: Schwartz, "Primary Administrative Jurisdiction and the Exhaustion of Litigants," 41 Geo. L. J. 495 (1953).

This Court gave its approval to the application of the doctrine of primary jurisdiction in *Kavanaugh v. Underwriters Life Insurance Co.*, 1950, 231 S. W. 2d 753, writ refused. That was an action by shareholders and policyholders against a mutual assessment insurance company to require, among other things, the removal of officers of the company, the election of new officers, and an accounting from the officers for funds paid to themselves and others. The Court pointed out that the statutes specifically authorized the Board of Insurance Commissioners to order the removal of officers, to require the election of new officers, to approve the officers and directors elected, and to make and supervise audits and accounts. The court concluded that the Legislature had vested the Board with primary jurisdiction in suits of this character and that the trial court correctly sustained a plea to its jurisdiction.

Gregg also relies heavily on *Railroad Commission v. Gulf Production Co.*, (1939), 134 Texas 122, 132 S. W. 2d 254. There Tippett already had two wells on 4.7 acres, and he got a permit from the Commission for a third. Upon appeal, the District Court set aside the third permit and ordered the third well plugged. This Court affirmed the action of the trial court in striking down the permit because under it, Tippett would have been allowed to recover "more than his fair share of the oil and gas in and under his land." It was held that the granting of the permit to prevent confiscation constituted an abuse of power by the Commission. This Court sustained that portion of the judgment which enjoined the operation of the well. But it reversed that part of the judgment by which the trial court ordered the well to be plugged. It reasoned that the Legislature had specifically delegated to the Commission the supervision of plugging of wells. The statute left to the Commission the best way to have the well plugged so as to protect fresh water, waste of gas, and danger from blowout. This was an administrative matter only. We do not regard the case as authority for Gregg's position here.

On the other hand, Delhi-Taylor and its counsel point out that the Legislature has not specifically delegated to the Commission the question of subsurface trespass or sand fracturing; that the Commission itself asserts no such power; that it has made no rules regarding the subject though requested to do so by Gregg;[6] and that two of the three Commissioners, while say-

6. On December 9, 1959, Gregg et al. requested the Commission to enter field rules including one which would authorize any operator to "sand frac" by using

ing that sand fracturing was a standard practice, declined to be drawn into this controversy.[7]

Delhi-Taylor contends that the Commission would have no authority to authorize a trespass onto its land;[8] that the Commission does not have the power to make lawful an unlawful trespass; that no administrative discretion is involved because the Commission would have no discretion to authorize the trespass; that it has no power to transfer property rights in gas (the gas itself) from one person to another; that the law of capture could not be extended by the Commission to "capture by trespass"; that this is not a question of *how* a well should be completed but where it is completed. It contends that the theory of "primary jurisdiction" in the Commission is not applicable here because the Legislature has not attempted to delegate that power, exclusive or concurrent, to the Commission; and that the question here is one of law.

The basic facts are relatively simple. Gregg has a well drilled into the Hansen sand at a depth of about 9,400 feet. The sand is hard and fairly tight. To increase the productivity of the well, Gregg planned to fracture the sand by shooting sand and liquid at very high pressure through holes in his drilling pipe. We understand that it is undisputed that the fractures will be about 1/10th of an inch in diameter at the well and diminish to zero, and that they will be supported by the injected sand. The gas can then reach the well through these cracks or veins. In this case, the trial court did not allow the introduction of evidence. So we have no evidence as to how far from the well the cracks

a maximum of 20,000 gallons of fluid and 40,000 pounds of sand per well. On March 9, 1960, after trial of this case, the Commission did adopt field rules, but did not adopt or make a rule on sand fracturing.

7. After the District Court in Hays County held on January 11, 1960, that it had no jurisdiction, and while this case was on appeal, Delhi-Taylor applied for relief to the Commission. Commissioner Thompson noted on January 13, 1960, "I do not believe we should go into the matter of trespass and therefore we shall pass up this request." Commissioner Culberson agreed. The action of the third Commissioner, Murray, is not shown.

8. Humble Oil and Ref. Co. v. L. & G. Oil Co., 1953, 259 S.W. 2d 933,939, writ refused, N.R.E., involved a construction of the Commission's rule regarding permits for the directional drilling of a well. The rule required a hearing but did not provide for notice to adjoining landowners. Humble attacked the validity of the L. & G's permit because it had been given no notice of the hearing. In his concurring opinion, Judge Hughes agreed that Humble need not have had notice because the Commission could not enlarge its jurisdiction by giving notice: "* * * the Commission could not grant authority for one person to trespass on the property of another * * *." Hence, he concluded, "It would be idle for the Commission to give notice of its intention to perform and act beyond its jurisdiction." 259 S.W. 2d at 939.

will extend. Delhi-Taylor alleged that they would extend beyond Gregg's property lines and into its portion of the gas reservoir. Gas which was under Delhi-Taylor's land would thus be produced by Gregg. The question remains: do the courts have authority to issue an injunction to ascertain whether there is a trespass, and to enjoin it if there is?

We think the courts do have this jurisdiction. The questions presented are primarily judicial in nature. Where the issue is one inherently judicial in nature (as we think the question of trespass is), the courts are not ousted from jurisdiction unless the Legislature, by a valid statute, has explicitly granted exclusive jurisdiction to the administrative body. The Legislature has not attempted to do so here, and we have no question as to the constitutionality of such a delegation. This was the holding of the Supreme Court of Arkansas in *Spartan Drilling Co. v. Bull*, 1952, 221 Ark. 168, 252 S. W. 2d 408. There the defendant oil producer was allowing large quantities of salt water to escape into a creek. Suit was brought to enjoin such action. Among other things, the oil producer contended that the Oil and Gas Commission had primary jurisdiction; that the Legislature had authorized the Commission to make rules regarding the prevention of pollution by salt water. The Commission, as here, had made no rules. It was held that the courts did have jurisdiction to issue an injunction.[9]

Gregg would distinguish the Arkansas case on the ground that the Arkansas Legislature *authorized* the Commission to make rules whereas the Texas Act *directed* the Commission to make rules and said that it should be its duty to do so. We do not regard the distinction as being substantial as applied to the question before us.

■ We think the allegations are sufficient to raise an issue as to whether there is a trespass. The invasion alleged is direct and the action taken is intentional. Gregg's well would be, for practical purposes, extended to and partially completed in Delhi-Taylor's land. The pleadings allege a physical entrance into Delhi-Taylor's leasehold. While the the drilling bit of Gregg's well is not alleged to have extended into Delhi-Taylor's land, the

---

9. The Arkansas Court went even further to say that even if the Commission had enacted rules, there was nothing in the legislative Act which showed an intention that jurisdiction of the Commission would have been *exclusive;* that the courts and the Commission would have had concurrent jurisdiction. Since the Texas Commission has made no rules, we need not decide this question here.

same result is reached if in fact the cracks or veins extend into its land and gas is produced therefrom by Gregg. To constitute a trespass, "entry upon another's land need not be in person, but may be made by causing or permitting a thing to cross the boundary of the premises." *Glade v. Dietert,* 156 Texas 382, 295 S. W. 2d 642 at 645, quoting from 87 C. J. S., Trespass §13.

This Court heretofore has enjoined subsurface trespass. In *Hastings Oil Co. v. Texas Co.,* 1950, 149 Texas 416. 234 S. W. 2d 389, it was alleged that Hastings had drilled a well which so deviated from the vertical that it was actually bottomed under lands held by the Texas Company. The trial court enjoined Hastings' operations and directed that a survey be made to determine whether the hole had been directionally drilled. This Court sustained that holding upon the allegation of a trespass and a finding by the trial court of probable cause to believe that the trespass had occurred. This Court quoted with approval from High on *Injunctions* (4th. ed.) §730, the principle that in instances of mining property, *greater latitude* is allowed courts of equity than in restraining ordinary trespass since the trespass is irreparable and goes immediately to the destruction (drainage) of the minerals themselves.

This Court also held in the *Hastings* case that Article 4644 was not applicable. That statute prohibits the issuance of an injunction unless the operator (driller) is unable to respond in damages. It was held that this statute applied to injunctions to restrain a person from drilling on his own land and "not to one taking oil from the land of the adjoining owner by means of a deviated well." 234 S. W. 2d at 397. This holding was followed in *Baton v. Key Production Co.,* 1958, 315 S. W. 2d 59, writ refused, N. R. E., in which the court enjoined the drilling of a well at an unauthorized location.

Counsel for Gregg says the *Hastings* case is not controlling because the question of primary jurisdiction was not there raised. Assuming that this is true, the Court could nevertheless have raised the question of jurisdiction on its own motion.[10] One of the main supports for the doctrine of "primary jurisdiction" is one of self-restraint on the part of the court. It originated as a court-made rule.[11] The *Hastings* case was decided in

---

10. McCauley v. Consolidated Underwriters, 1957, 157 Tex. 475, 304 S.W. 2d 265.

11. Davis, 3 *Administrative Law Treatise* 53, Primary Jurisdiction, §19.09. This certainly is true where the Legislature has not directly attempted to take jurisdiction from the courts and to confer it upon an administrative body.

the same year (1950) and after the refusal of the writ of error in the *Kavanaugh* case, supra, in which the rule was applied as to an action involving the Board of Insurance.[12] It must be assumed that the Court was familiar with the rule.[13]

Gregg contends that if the Commission authorized the action pursuant to its authority to prevent waste, protect correlative rights, or in the exercise of other of its powers, the action would not be a "trespass," and would not be subject to injunction. He relies on *Corzelius v. Railroad Commission*, 1944, 182 S. W. 2d 412 (no writ). There Corzelius and Harrell owned all of the oil and gas leases over a gas reservoir. Corzelius' well developed a dangerous leak. The Commission ordered him to remedy it, but he could not. The well blew out with disasterous results. Five of Harrell's wells were destroyed. The Commission ordered Corzelius to kill the well by any means, including the drilling of a directional well. But he couldn't afford it. So the Commission authorized Harrell *as its agent* to drill a directional well from his (Harrell's) and to kill Corzelius' burning well. Corzelius contended that the Commission had no such power; that it would constitute a trespass onto his land. The Court upheld the Commission's order which was designed to stop the holocaust and to prevent the enormous waste of gas. It likened the case to the situation in which fire departments are authorized in emergencies to go on or across private land to put out fires. The Court of Civil Appeals said, and Gregg here relies on the statement: "And being authorized by law, such entry did not constitute a trespass." This Court was not called upon to approve or disapprove the opinion. In any event, we do not regard the holding as authority for the proposition that the type of deliberate action

12. Record of this Court show that the writ was refused in the *Kavanaugh* case on October 10, 1950, and the opinion in the *Hastings* case was released on November 15, 1950.

13. As a matter of fact, Point IV of the motion for rehearing in the *Hastings* case was: "The opinion of this Court ignores the jurisdiction of the Railroad Commission of Texas to pass first upon the matter complained of by Petitioner as an original proceeding." The argument thereunder asserted the doctrine of primary jurisdiction in the Commission; that the Commission was the agency created to handle these problems in the first instance; that its action should be reviewed by the District Court in Travis County; that no reasons were advanced which ousted the Commission of jurisdiction; that the Commission is equipped to handle directional drilling; that the Commission could have ordered and supervised the survey of directional drilling; that there should be one uniform rule by the Commission and that "that administrative problem is by this Court's opinion now scattered to the many District Courts of Texas rather than concentrating such problems in Travis County"; that District Courts might as properly now grant exceptions to Rule 37; and that this Court should hold that administrative problems of the oil and gas industry should first be presented to the Railroad Commission.

here involved for the purpose of increasing production even across property lines would not be a trespass, or as authorizing the Commission to license such action. As stated, we regard that as an open question not necessary to decide here.

This Court has passed upon other subsurface oil and gas problems. Two of the leading subsurface tort cases are *Elliff v. Texon Drilling Co.*, 1948, 146 Texas 575, 210 S. W. 2d 558, A. L. R. 191, and *Comanche Duke Oil Co. v. Texas Pacific Coal and Oil Co.* (Texas Comm. App. 1927), 298 S. W. 554. The Elliff Case was a suit for damages based on negligence (failure to use the correct drilling mud). The defendant's well blew out, cratered, and burned for several years. The craters extended to plaintiff's land, and one of its wells also blew up. Vast amounts of gas were wasted, largely through the defendant's land. In upholding a judgment for plaintiff, this Court said, "Each owner of land owns separately, distinctly and exclusively all the oil and gas under his land *and is accorded the usual remedies against trespassers who appropriate the minerals or destroy their market value.*" 210 S.W. 2d at 561 (Emphasis ours.)

In the *Comanche Duke* case, the plaintiff's well was destroyed by the negligent "shooting" of the neighboring defendant's well with 600 quarts of nitroglycerin. In defining the right of ownership of the mineral estate, the Commission of Appeals wrote in terms of vertical boundary lines:

> "In illustration, it may be said that one owner could not properly erect his structures, surface or underground, in whole or part beyond the dividing line, and thereby take oil on or in the adjoining tract, or induce that oil to come onto or into his tract, so as to become liable to capture there or prevent the owner of the adjoining tract from enjoying the benefit of such oil as might be in his land or as might come there except for these structures." 298 S. W. 554, at 559.

■ Finally, Gregg argues that the Commission is specifically authorized by statute to supervise the shooting of wells, the drilling and completion of wells, to enact rules for the prevention of waste and to require wells to be drilled and operated in such a manner as to prevent injury to adjoining property. He argues that this grant of authority places primary jurisdiction in the Commission.

We do not understand counsel for Gregg to argue that the process of sand fracturing and "shooting" are the same process. Those two operations have some things in common, but we do not regard the statute on "shooting" to cover the process of sand fracturing.

It may be granted that the Commission does have authority to supervise the drilling and completion of wells, and it may also be granted that sand fracturing is a standard and beneficial practice. But as stated in the dissent in the Court of Civil Appeals 337 S.W. 2d 479, in the companion case (*Delhi-Taylor Oil Corp. v. Holmes*), (Post 39, 344 S.W. 2d 420), the question is not how but where the well will be drilled and completed. It involves the question of trespass and whether the law of capture includes the right to capture by artificial means or capture by trespass.

It is also granted that the Commission has the power to enact rules to prevent waste. There is nothing in this or the companion cases to show that sand fracturing will either cause or prevent waste. While the process may increase production from an individual well, there is nothing in any of these cases to show that the process is necessary from the public's standpoint to increase the total recovery from the common source. In any event, no such rules have been promulgated. Similarly, no rules have been promulgated in this area to require "drilling and operations" in such a manner as to prevent injury to adjoining property. When and if they are, this Court may pass upon them. The courts are not impotent meanwhile.

This same reasoning applies to Gregg's contention that in any event no harm can result from sand fracturing across property lines because the Railroad Commission can and will see to it that correlative rights are protected in allocating allowables; that each will be allowed to produce his fair share anyway; and that this is the Commission's exclusive duty. If in this State each person simply owned an undivided share of a common pool of gas which was to be allocated by the Commission, Gregg's reasoning would be correct. But it has long since become a rule of property in this State that "each owner of land owns separately, distinctly and exclusively all the oil and gas under his land." *Elliff v. Texon Drilling Co.*, 1948, 146 Texas 575, 210 S. W. 2d 558, 4 A. L. R. 191. That opinion says that the gas is subject to regulation and to legitimate drainage under the law of capture, but that the owner "is accorded the usual remedies against trespassers who appropriate the minerals or destroy

their market value." Moreover, the same reasoning would render harmless the bottoming of directionally drilled wells on the property of a neighbor,—that the Commission could still see that everybody got their fair share of the oil or gas in the common reservoir. This argument was made and rejected in *Alphonso E. Bell Corp. v. Bell View Oil Syndicate*, 1938, 24 Cal. App., 2d 587, 76 P. 2d 167, at pages 174 and 175. And this Court in the *Hastings* case, cited above, held that the bottoming of a directionally drilled well upon the land of a neighbor constituted an enjoinable trespass.

We are advised by an amicus curiae that the Commission has promulgated rules or orders which might authorize, or result in, the invasion of the subsurface of the land of others. Our attention is called to secondary recovery operations involving water or gas injection, waterflooding, the injection and storage of salt water, and the recycling of gas. We have heretofore indicated that no rules of the Commission are involved in these Delhi-Taylor cases. The validity and reasonableness of the rules and orders involved in those operations may be passed upon when and if they reach the Court.

The judgment of the Court of Civil Appeals is affirmed.

Associate Justice Hamilton not sitting.