Gene MANGHAM et al., Appellants,

v.

V. K. HALL and Betty Hall, Appellees.

No. 1258.

Court of Civil Appeals of Texas, Corpus Christi.

March 31, 1978.

Rehearing Denied April 20, 1978.

A. A. Munoz, II, Atlas, Hall, Schwarz, Mills, Gurwitz & Bland, McAllen, for appellants.

H. H. Rankin, Jr., William Gamble, Rankin & Kern, McAllen, for appellees.

## OPINION

BISSETT, Justice.

This suit was brought by V. K. Hall and Betty Hall against Gene Mangham, d/b/a Mangham Air Conditioning, and Valcon, Inc., to recover damages for destruction of plaintiffs' fence, for "loss of business" resulting from alleged acts of trespass, and for exemplary damages. The case was tried to a jury and based on a verdict, the trial court rendered a joint and several judgment against the defendants, which awarded the plaintiffs actual damages in the amount of $10,000.00 for "loss of business"; $165.08 for the destruction of a fence; and $10,000.00 for exemplary damages. Defendants have appealed.

In view of our decision to reverse the judgment of the trial court and remand the cause, we summarize only the portions of plaintiffs' pleadings which are pertinent to our disposition of this appeal.

Plaintiffs alleged that they were the owners of a laundromat business; that "beginning about 1967", Mangham, who owned real property adjoining a parking lot owned by the plaintiffs and used by their customers, began the construction of a building, which was built for him by Valcon, Inc.; that during the course of the construction the defendants drove their heavily loaded trucks over and across the parking lot of the Halls and committed certain other enumerated acts of trespass; that following the completion of the building, the defendant Mangham continued to trespass upon the parking lot, and "this continued until in the year 1969", when Valcon built a new building "on the front part" of the first building for Mangham; that the defendants, during the course of construction of the new building in 1969, actually ordered plaintiffs' customers to move their cars from plaintiffs' parking lot; that the customers quit using plaintiffs' laundromat because of defendants' trespasses; and that "same continued as a continuing trespass from May 1969 to October 1969". Plaintiffs further alleged that the trespasses committed by the defendants which took place "almost throughout the year 1969", also:

"[c]aused great and serious damage to Plaintiffs as their business had continued to increase even while the trespass of the Defendant Mangham continued prior to the construction of the new building but

during the year 1969, while Valcon, Inc., was building the building for Defendant Mangham, the business of the laundry of Plaintiffs on the adjoining property continued to fall off instead of increase as it had done before and was doing when these Defendants began the building and the decrease in the volume of business was pronounced and severe, caused by the high-handed method used by the Defendants Mangham and Valcon, Inc., in forcing their trespass upon the property of Plaintiffs and against Plaintiffs' customers until the actual damages to Plaintiffs during the period of time by the trespass of both Mangham and Valcon, Inc., was at least $10,000.00 and the damage done by them in tearing down Plaintiffs' chain link fence and destroying the material which amounts to $200.00. . . ."

Mangham and Valcon, Inc., in their first point of error, complain that the trial court erred in submitting Special Issue 7 over their objection that the issue as submitted with the term "loss of business" does not take into consideration "the fact that any expenses incurred in generating any loss of gross income would have to come out of that figure and as a matter of law the Plaintiffs are entitled to recover their net profits." The point must be sustained.

Special Issue 7 and the jury's answer thereto, reads:

"SPECIAL ISSUE NO. SEVEN

Did V. K. and Betty Hall sustain a loss of business as a result of the actions of Gene Mangham and Valcon, Incorporated which you have found in answer to the preceeding (sic) issues?

Answer: 'Yes' or 'No'.

We, the jury, answer: Yes."

Defendants also filed a motion for judgment non obstante veredicto, wherein they asked that the jury's answer to Special Issue 7 be disregarded. The motion was overruled.

Since our disposition of the first point of error is decisive of this appeal, it is not necessary that we set out in detail all of the evidence adduced at the trial. Suffice it to say that the above quoted allegations contained in plaintiffs' trial petition concerning defendants' alleged acts of trespass are fully supported by the evidence. The proof further shows that plaintiffs did lose customers in 1969 during the period that the second building was under construction because of such trespasses by both defendants. No issues were requested and none were submitted relating to the trespasses allegedly committed solely by Mangham as "a continuing trespass" from "sometime in 1967" until the time the second building was finished in October, 1969.

Plaintiffs owned and operated five laundromats in McAllen, Texas, at and prior to the time that this suit was filed. The laundromat and its adjoining parking lot here involved was purchased by plaintiffs in 1964. It was called the "Whitecap". The business was an established business by 1967. It was closed in July, 1975.

Mrs. Hall kept the records for the Whitecap. The records consisted of gross receipts only. The gross receipts for the years 1964–1973 were introduced in evidence. Under the pleadings, only those for the years 1966–1969 could possibly have any bearing on this appeal. The gross receipts for those years were:

| | |
|---|---|
| 1966 | $27,991 |
| 1967 | $25,793 |
| 1968 | $25,245 |
| 1969 | $20,068 |

Concerning the expectations which the plaintiffs had with respect to the business expected, Mrs. Hall testified:

"A Well, we always felt that it should increase, oh, at least, from a Thousand to Fifteen Hundred a year. And, a laundry of that size when we bought it, we had hopes that it would continue to increase at least to Thirty Thousand Dollars a year, but it never did reach that."

The only testimony with respect to profits is from Mrs. Hall, when, in response to the questions asked her, said:

"Q So, this loss that we see from Twenty-Seven Thousand to Twenty-Five

Thousand in 1967, approximately Two Thousand Dollar drop, that isn't all profit; is it, Mrs. Hall?

A No.

Q Do you have any idea how much of that would have been profit?

A How much would have been profit?

Q Yes?

A I would say at least thirty percent."

When asked if she had "any idea of what the expenses for the Whitecap would run", Mrs. Hall responded:

"A Well, we were buying the property and I think if you will look to the front of the notebook, I had—Well, what originally started out as the monthly payments and we would have the property and the taxes. No, I am sorry. They were included in the payment of the building. And, then, you would have your utilities. You would have parts and repairs and expenses and things of that sort."

She further stated that she did not have records which showed the expenses for the Whitecap, because she did not keep those records separately and apart from the records for the other laundromats operated by plaintiffs.

Mr. Hall testified, in summary, that the Whitecap was "getting off the ground" prior to the time of "the problem" in 1969. He was told to assume that the gross receipts in 1969 were $5,000.00 less than the gross receipts in 1968. With that assumption, he was asked:

"Can you tell us whether or not that would cause a corresponding decrease in your expenses, and fixed expenses, your operating expenses?"

He answered:

"It would be very small, because mostly your expenses are fixed. So much each month."

Mr. Hall further testified:

"Q Isn't it a fact that about the only expenses that would go up when business goes up is your utility bills?

A Yes. And, that would go up some with it, but probably only maybe ten

per cent, more or less, or something like that, or five per cent."

Damages must be measured by a legal standard, one which serves to guide the fact finder in determining what sum will compensate the injured party. The measure of damages in a given case is a question of law and should be given in the charge of the court to the jury. *International-Great Northern R. Co. v. Casey*, 46 S.W.2d 669 (Tex.Comm'n App.1932, holding adopted); *McMahan v. Musgrave*, 229 S.W.2d 894 (Tex.Civ.App.—Eastland 1950, writ dism'd). While the form for submission of a particular special issue is left to the sound discretion of the court according to the requirements of each case, the submission must be sufficient to enable the jury to make an award of damages on proper grounds and correct principles of law. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87 (Tex.Sup.1973); 17 Tex.Jur.2d, Damages, § 315 (1960).

Where a business which was already established and was making a profit at the time a person trespassed on property which was used by the business, and the trespass resulted in a diminution in the amount of gross receipts which could have been expected in the light of past developments, existing conditions, and reasonable forecasts, the owner of the business is entitled to recover damages for the actual loss (profits) sustained by him because of the trespass. *Southwest Battery Corporation v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938); *Texas & P. Ry. Co. v. Mercer*, 127 Tex. 220, 90 S.W.2d 557 (Tex.Comm'n App.—1936, opinion adopted); *Cain v. Fontana*, 423 S.W.2d 134 (Tex.Civ.App.—San Antonio 1967, writ ref'd n. r. e.); 17 Tex.Jur.2d, Damages, § 145 (1960). Such a loss of profits because of the diminution of "gross receipts" is measured by the loss of "net profits" and not the loss of "gross receipts", except where the actual expenses which would have been incurred had the "gross receipts" been received are fixed with reasonable certainty. *Hall v. Brown*, 398 S.W.2d 404, 408 (Tex.Civ.App.—Waco 1966, no writ); *American Const. Co. v. Caswell*,

141 S.W. 1013, 1018 (Tex.Civ.App.—Austin 1911, no writ); 25 C.J.S. Damages § 90 (1966).

The term "net profits" is, "to a large degree, selfexplanatory and implies, generally speaking, what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business". *G & W Marine, Inc. v. Morris*, 471 S.W.2d 644 (Tex.Civ.App. —Beaumont 1971, no writ). Or, as said in *Stapper v. Van Valkenburgh & Vogel*, 128 S.W.2d 466, 467 (Tex.Civ.App.—Amarillo, 1939, writ dism'd, judm. corr.):

"[t]he words 'net profits' . . . means the money received from the sale of goods after deducting their costs and expenses."

The Court, in *Giles v. Rayburn*, 173 S.W.2d 371, 373 (Tex.Civ.App.—San Antonio 1943, no writ), said:

"[I]t is academic that, in general, net profits of an operation are ascertainable by deducting the actual expenses from the gross earnings of the business. The difference between those items constitutes the net profits . . . ."

In "the calculation of net profits, allowance should be made for expenditures that the plaintiff would have been compelled to make". 17 Tex.Jur.2d, Damages, § 144 (1960).

■ The law, in cases where plaintiffs seek a recovery for loss of profits sustained by reason of a defendant's trespass which causes a reduction in gross receipts which otherwise would have been received by the plaintiffs in the operation of their business, demands that the plaintiffs prove by evidence of probative value all "factual data which supported their claim to lost profits". *International Harvester Company v. Kesey*, 507 S.W.2d 195 (Tex.Sup.1974). The plaintiffs did not meet their burden in this case.

In *Jackson v. Fontaine's Clinics, Inc.*, supra, the plaintiff pleaded that the acts of the defendants "would prevent plaintiff from deriving the normal pecuniary reward from its business activities that it otherwise would have been entitled to attain. While it was not clear, apparently the plaintiff sought a recovery for loss of net profits. In the issue pertaining to damages, if any, sustained by the plaintiff by reason of the defendant's acts, the jury was instructed that the members thereof could take into consideration:

"(a) the reasonable cash value, if any, of the loss of *monetary reward* from Fontaine's Clinics, Inc.'s business activities."

The defendant contended, in part, that the instruction permitting the jury to find losses was not supported by the evidence. The contention was sustained. The Court, at page 90, said:

"[H]owever, the jury was given no guideline for determining a loss of net profits. Manifestly, the phrase 'monetary reward' does not describe net profits, and no other instruction was given connecting that phrase with net profits or with any other recognized measure of damages.

We hold that this submission was factually defective, because it simply failed to guide the jury on *any proper legal measure of damages*."

The logic and reasoning in that case should be applied in this case.

■ It is our opinion that the language of Special Issue 7 would mislead a reasonably intelligent jury into finding that plaintiffs were entitled to gross revenues, that is, with no deduction of operating expenses. Our view is that while "net profit" is a word of common usage and whose meaning is readily understood, it is not synonymous with the term "loss of business". Plaintiffs cite *Southwest Battery Corporation v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938), as authority that such terms are used synonymously by the courts. We do not agree. In *Owen*, the court was concerned with the speculative nature of "profits" in a fledging business including what factors make such profits certain and not with whether the jury was given a proper measure of damages with which to determine the amount of lost profits. We do not question the principle that uncertainty as to the amount of damages will not defeat recovery.

Plaintiffs further contend that *Cain v. Fontana*, supra, is also authority that the terms "loss of business" and "profits loss" are "not only synonymous, but more importantly, judicially accepted as the proper language upon which to submit issues regarding the loss of income sustained by a business as a result of an intentionally inflicted trespass". We are not in agreement with that contention. In the cited case, the trial court did submit an issue on whether the plaintiff suffered a "loss of business" as a result of the defendant's trespass. However, the defendant, on appeal, attacked the findings by the jury that the plaintiff sustained a "loss of business" and that the plaintiff was damaged in the amount of $250.00 for such "loss of business" solely on the grounds of "no evidence" and "factually insufficient evidence". That is not the case here, for, in this case the defendants challenge the submission of Special Issue 7 on the grounds that the trial court, in submitting an inquiry into "loss of business" submitted an improper measure of damages, and the proper measure was "lost profits". Moreover, in the *Cain* case, there was evidence that in the months of January and February the plaintiffs' business had a net profit of $533.31 and $565.17, respectively, a loss of $188.95 in April, and a loss of $441.57 in May (the month of the trespass). The Court of Civil Appeals held that preexisting profits may be considered in arriving at a just estimate of the amount of profits lost. It was not error to submit the issue of "lost business" in the *Cain* case, since the defendant did not object to its submission on the ground that it submitted a wrong measure of damages. Clearly, there was evidence to support the finding that $250.00, which was substantiated by evidence that such was, actually, a loss of "net profits". That is not true of the instant case.

It is clearly established by the evidence that the gross receipts from the Whitecap for the years 1967 and 1968 were substantially the same, and, as testified by Mr. Hall, the business was "getting off the ground". It can only be concluded from the evidence that the drop in the amount of gross receipts (approximately $5,000.00) in 1969 was caused by defendants' acts in 1969 during the time that the second building was under construction. It is further conclusively established by the evidence that the expenses of operating the Whitecap were largely fixed, but there is no evidence as to the amount in dollars and cents of any such expenses incurred in operating that particular laundromat for 1969 or for any other year. While Mr. Hall testified that "about the only expenses that would go up when business goes up is your utility bills", and that the increase in the utilities would "probably only maybe ten per cent, more or less, or something like that, or five per cent", that testimony does not establish a basis for a determination of what the expenses would have been had the Whitecap grossed $5,000.00 more in 1969 over the actual amount which it did gross. The "net profits" of the Whitecap were not established for the year 1969, or for any other year.

It is common knowledge that the cost of utilities may vary from year to year because of changes in price in the unit of measure. The complaint in this case is anchored on the loss of gross receipts in the year 1969, not 1967. No question was asked of Mrs. Hall as to what percentage of the $5,177.00 diminution in gross receipts in 1969, when compared with those of 1968, would have been profit.

Plaintiffs are not entitled to recover the amount of gross receipts which they lost and would have received but for the trespasses of the defendants. Such a recovery would be a windfall to them, the effect of which would be to place them in a better financial condition than they would have occupied had the trespasses not occurred. We believe that there was some evidence to show a considerable loss of net profits, but the case was submitted on the wrong measure of damages. Defendants' objections to the submission of Special Issue 7 should have been sustained. The proper measure of damages in this case is loss of net profits, which would be the difference between the total amount of gross receipts and the total amount of operating expenses which would have been incurred by the plaintiffs had the

"lost gross receipts" been received by them. Defendants' first point is sustained.

Since this case will be reversed and remanded, it is not necessary that we consider or discuss any of defendants' remaining points.

■ The sustaining of defendants' first point requires a reversal of the trial court's judgment, but does not require that we render a take nothing judgment, as defendants request in their brief. We believe that the ends of justice would be better served by reversing and remanding for a new trial rather than reversing and rendering judgment that plaintiffs take nothing in their suit against defendants. Rule 434, T.R.C.P.; *Atchison, T & S. F. Ry. Co. v. Scott*, 551 S.W.2d 740 (Tex.Civ.App.—Beaumont 1977), aff'd, 21 Tex.Sup.Ct.J. 126 (Jan. 7, 1978); *National Life and Accident Insurance Company v. Blagg*, 438 S.W.2d 905 (Tex.Sup.1969); *Texas & Pacific Railway Company v. Van Zandt*, 159 Tex. 178, 317 S.W.2d 528 (1958); *General Supply and Equipment Co., Inc. v. Phillips*, 490 S.W.2d 913 (Tex.Civ.App.—Tyler 1972, writ ref'd n. r. e.); *U. M. & M. Credit Corporation v. Doss*, 452 S.W.2d 45, 48-9 (Tex.Civ.App.—Dallas 1970, writ ref'd n. r. e.).

The judgment of the trial court is REVERSED and the cause is REMANDED for a new trial.