**GEO VIKING, INC., Appellant,**

v.

**TEX-LEE OPERATING COMPANY, Appellee.**

No. 6–90–044–CV.

Court of Appeals of Texas, Texarkana.

July 16, 1991.

Rehearing Overruled Sept. 24, 1991.

Cornelius, C.J., filed concurring opinion on motion for rehearing.

Grant, J., filed dissenting opinion on motion for rehearing.

H. Dustin Fillmore, Fillmore & Harrington, Fort Worth, Michael J. Simmang, Simmang & Hall, Giddings, for appellant.

James S. Robertson, Jr., Robertson & Miller, Dallas, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

OPINION

GRANT, Justice.

Geo Viking, Inc. appeals from an adverse judgment in a deceptive trade practices action awarding damages to Tex–Lee Operating Company for Geo Viking's conduct in its fracing of an oil well drilled by Tex–Lee.

Geo Viking contends that there was no evidence or insufficient evidence to support the jury's answers finding tortious activity and finding that the activity was a proximate or producing cause of any actual damages, that the trial court erred in overruling their objections to the submission of jury questions and the related instructions, and that the court erred in rendering judgment on these jury questions because the conduct did not constitute the breach of any legal duty. Geo Viking also contends that the court erred in refusing to include a requested instruction, that additional damages were improper, that there was no evidence to support the award of actual damages, and that the trial court erroneously computed pre- and post-judgment interest.

Tex–Lee brought suit against Geo Viking to recover damages under the Deceptive Trade Practices Act for an improperly performed frac job on an oil well. Tex–Lee had drilled an 8,000–foot well in the Austin Chalk Formation in Lee County, Texas. This formation is characterized as an extremely tight formation containing intermittent fractures which must be tapped in order to obtain oil. This well missed the fracture, and Tex–Lee hired Geo Viking to sand frac the well. This operation is designed to loosen or break up tight formations which contain oil or gas, thus causing the formations to have more permeability and greater production.

Fracing involves the injection of a mixture of liquid and sand into the producing formation under extremely high pressure by means of pressure pumps. Initially, a gel containing very fine sand in suspension is pumped into the casing and is pressurized through perforations in the casing into the producing formation. The pressure forces the cracks open, and the fine sand fills and seals the smaller cracks closed, so that the later injections will be concentrated on the largest fractures. After this is done, increasingly heavier concentrations of a much larger grade of sand is similarly injected into the rock strata. This sand props the rock formations open so that oil and gas may return through the cracks thus created to the well site.

Various engineering concepts may be applied to the different variables involved to calculate the distance that the fracing gel and sand has proceeded away from the well. The well in the present case was drilled in an effort to hit a fault which was supplying production for another well approximately one-half mile away. The well missed the fault and fracture system and produced a minimal amount of oil for the first two weeks of its existence. Tex–Lee accordingly decided to frac the well. They contacted Geo Viking, specifying that two blenders would be required, a primary and backup, and that they wanted a "propped" length of 1,000 feet away from the well site. Geo Viking designed the frac job to meet these specifications. The blender mixes the sand with a gel-like semi-liquid which holds the sand in suspension during the injection and forces the combination into the well under extremely high pressure. The gel was chemically designed to break down into liquid after about two hours, depositing the sand in the formation and "propping" the fracture system open.

Geo Viking brought two blenders to the well site. Shortly after they began the job, the first one broke down. Instead of using the backup, Geo Viking asked to bring another blender from their yard in Bryan, Texas. Tex–Lee's representative agreed to this and approximately two hours later, the third blender arrived. Tex–Lee admitted it suffered no damages because of this delay. The new blender was put in service, and the frac job was resumed. At that point in the job during which the larger diameter of sand was beginning to be injected into the well, the new blender also broke down. At that point, Geo Viking's representatives admitted that the original backup, which was sitting beside the well site, had failed the day before and that they knew it was not

operational when they brought it to the location as a backup blender. Because the gel holding the sand in suspension was designed to break down in two hours, it was impossible to obtain another pump before the sand was deposited in the well bore and surrounding locations.

At that time, the length of the hydraulically created fractures had reached approximately 2,500 feet from the well site. The length of the hydraulically created fractures that were propped at that time was, according to one expert, 550 feet, and 640 feet according to another expert. The testimony also indicates that at the point at which the second truck broke down only the lightest sand mix had gone into the fracture zone. Accordingly, the only material that had entered the fracture area was the sand designed to seal small fractures. Tex–Lee's expert testified that this resulted in effectively plugging the main fracture system because the fine sand was never forced out of the main system (approximately 88,000 pounds of mix). He also testified that any effort to re-frac would be futile because of the silt deposits left in the microfractures by the first effort. The well never produced oil in paying quantities and was eventually plugged.

Another well, the White # 1A well, was drilled shortly thereafter approximately 250 feet away from the first well. It was also a nonproducer, which was unsuccessfully fraced and eventually plugged.

After hearing all the evidence, the jury found that:

(1) the backup blender truck which was originally brought to the location of the White # 1 well was not fit for the ordinary purposes for which it was to be used when it was brought to the location and that this failure was a producing cause of damages to Tex–Lee.

(2) Geo Viking failed to frac the # 1 well in a workman-like manner and this conduct was a producing cause and/or proximate cause of damages to Tex–Lee.

(3) Tex–Lee was damaged because of its inability to extract the oil and gas in the amount of $300,000.

(4) the conduct of Geo Viking was done knowingly and that additional damages in the amount of $100,000 was appropriate as a penalty.

The jury also found that the action was not brought against Geo Viking in bad faith and provided attorney's fees. The trial court rendered judgment based upon the jury's answers to these questions, from which Geo Viking appeals.

Geo Viking first contends that there is no evidence or insufficient evidence to support the jury's findings that its conduct was a proximate or producing cause of damages to Tex–Lee. They argue that the evidence did not and could not prove that Tex–Lee was damaged because it was impossible to prove that any oil and gas existed at the White # 1 well site.

In our review of the legal and factual sufficiency of the evidence, we review the legal sufficiency of the evidence under the review standards of *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965), and the factual sufficiency under the review standards of *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). Thus, we will first examine the record for any probative evidence to support the finding, ignoring all contrary evidence. If we find some probative evidence, we will test the factual sufficiency of that evidence by examining the entire record to determine whether the finding is clearly wrong and unjust.

■■■ The measure of recovery for a breach of contract is a pecuniary loss shown to have been the natural, probable, and foreseeable consequence of the defendant's conduct or to have been within the contemplation of the parties. Recovery cannot be made for damages that are remote, contingent, speculative or conjectural. This does not exclude opinions and inferences. There is hardly any statement of fact that itself does not rely upon inferences. Any estimation of future damages involves an opinion as to probabilities. One who is damaged must not be deprived of a remedy merely because of the difficulties lying in the way of proving his damages, and the courts will not permit a guilty party to reap an advantage from his wrong

by insisting on a degree of proof which, by reason of his wrongful act, is unattainable. *North Texas Producers Association v. Young,* 308 F.2d 235 (5th Cir.1962), *cert. denied,* 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963); *Texas Sanitation Co. v. Marek,* 381 S.W.2d 710 (Tex.Civ.App.— Corpus Christi 1964, no writ).

■ Proof of loss involving an improperly completed well is by its very nature difficult to show. Nevertheless, before a plaintiff can recover damages, he must prove with reasonable certainty the damages he suffered from a defendant's breach. *See Whiteside v. Trentman,* 141 Tex. 46, 170 S.W.2d 195 (1943); *Texas Pacific Coal & Oil Co. v. Barker,* 117 Tex. 418, 6 S.W.2d 1031 (1928); *Amoco Production Co. v. Alexander,* 594 S.W.2d 467 (Tex.Civ.App.—Houston [1st Dist.] 1979, *modified,* 622 S.W.2d 563 (Tex.1981).

■ A qualified expert witness can provide opinion testimony about the probability of obtaining production and the extent of such production on the land in question. The probable reserves available for the particular well must thereby be proven with reasonable certainty.

■ Ray Holifield, the geologist who selected the site, was qualified as an expert. According to Holifield, his organization had been involved in the drilling of about 1,200 wells in the Giddings/Austin Chalk Formation in a four-county area. He testified that before the frac job, the well had flowed back at the rate of 200 to 300 feet of oil entry into the well bore per hour and that this indicated that there was some type of fracture system entering the well bore. Based upon their knowledge of wells in the area, Clarence Cheatham (the site foreman) and Ray Holifield testified that this situation indicated that the well was an excellent candidate to be a good producer upon completion of a frac job. Holifield also based his conclusion about the likelihood of obtaining oil from this well upon the proven reservoir pattern and production of fourteen wells that had been completed within a one-mile radius of White # 1 and calculated the reserve quantities from this information. This testimony constitutes some evidence to support the verdict.

Geo Viking points to evidence that a second well (the White # 1A) drilled only 250 feet away from the White # 1 was also a nonproducer to support its argument about the unpredictable nature of an oil and gas well. However, there is testimony that the fracture system surrounding this well was damaged by the uncompleted frac job performed on the previous well, as shown by the production of water during the frac job on the White # 1A. The uncontroverted testimony was that this liquid was necessarily the unexpelled water from the initial, aborted frac job. Tex–Lee experts testified that the frac job on the second well apparently intersected the aborted frac and that this would cause the frac job on well # 1A not to have its desired effect because of damage to the natural fracture system caused by the aborted frac on well # 1.

Geo Viking also points to evidence through expert testimony that the liquid and fine sand mix, which was successfully injected into the well before the failure of the blender, had extended approximately 2,500 feet away from the well site, two thirds of the proposed 3,570–foot distance. They testified that to this point no natural fracture system had been encountered, because it would have been reflected by a drop in pressure as the fluid escaped into a large fracture. They also testified that even the improperly completed frac job should have improved production from the well.

However, Tex–Lee's experts testified that, had the frac been properly completed, the mid-sized fractures, whose existence would not be reflected by a drop in pump pressure, would have allowed oil to be produced in quantity and also that the additional 1,000 feet might have intersected one of the major faults.

Although we are clearly speaking of probabilities rather than certainties, the evidence is sufficient to support the jury's answer. The point of error is overruled.

■ Geo Viking next contends that the trial court erred in overruling its objections

to this submission of Questions 1 and 2 and erred in entering judgment in favor of Tex–Lee based upon the jury's answers to Questions 1, 2, and 6. Question 1 asked the jury to find whether the backup blender truck that was originally brought to the location of the well was not fit for "the ordinary purposes for which it was to be used when it was brought to the location." Upon making an affirmative finding on Question 1, the jury was then asked whether this conduct was a producing cause of damages to Tex–Lee. The jury answered both questions yes and was accordingly directed to Question 6, where it found that the conduct was done knowingly.

This cause was tried under the DTPA, Tex.Bus. & Comm.Code § 17.50(a)(2) (Vernon 1987), on allegations that Geo Viking provided a defective backup blender truck to be used in providing the service that it sold to Tex–Lee and that this constituted a breach of Geo Viking's implied warranty of merchantability that the truck would be fit for the ordinary purpose for which it was intended. No contract is contained in the record, but all parties agree that the proposal made by Geo Viking to Tex–Lee serves as the agreement between the parties. It provides that two blender trucks would be at the location. There is considerable testimony by different witnesses that the standard in the area required two blender trucks because of the danger of causing the precise situation which eventually occurred in fracing this well. At no time were there two working blenders on site.

If one truck broke down, the second was to be on site so that the frac job could continue. It is uncontroverted that Geo Viking knew that the backup blender was broken at the time it was brought to the lease and that Tex–Lee was unaware of this. The first blender broke down shortly after they began pumping water into the casing. At this point, no damage would be caused by a shutdown. Geo Viking, without informing Tex–Lee that the backup blender was defective, suggested that they should close down for a couple of hours while another truck was brought from

their main yard. Tex–Lee's representative readily agreed to this, as he testified, because he wanted two operational blenders at the scene during the critical portions of the operation.

Question 1 was framed in accordance with the DTPA by asking the jury to determine whether the backup blender was fit for its intended purpose. The evidence is uncontroverted that the blender was broken when it brought onto the location, that they knew it was broken, and that they concealed this fact from the Tex–Lee workers. The testimony makes it equally clear that, in accordance with the custom of the industry, the drilling company representatives expected to have two *functioning* blenders on the well site in case one broke down. Cheatham testified that, had he known that the backup would not work, he would have insisted that another blender truck be brought to the scene, as provided for in the contract, in case the replacement broke down.

Accordingly, there *is* testimony which supports both the submission of these questions and the jury's answers to them. Geo Viking's final argument in connection with the submission of the producing cause issue that Geo Viking was not obligated to provide a particular backup blender is singularly inappropriate. The backup blender truck, as all other equipment, must be capable of performing the task for which it was designed. It was not. The evidence supporting the finding that Geo Viking's failure was a producing cause of damages has previously been detailed under the first point of error. These points are overruled.

■ Geo Viking next contends that the trial court erred in submitting Questions 3 and 4 over their objection and erred in entering judgment based upon these questions because there was no evidence to support the jury's verdict. Question 3 asked whether Geo Viking failed to frac the well in a "good and workman-like manner," and Question 4 asked whether this action was a producing or proximate cause

---

of damages to Tex–Lee.[1] An expert witness called by Tex–Lee testified that the intentional furnishing of equipment that was nonfunctional would hardly constitute accomplishing the frac job in a good and workmanlike manner. A witness called by Geo Viking, who was the vice-president of a company dealing with fracture design, testified on cross-examination that it would be irresponsible to send out a blender truck to serve as a backup knowing that it would not work. In *Melody Home Manufacturing Co. v. Barnes*, 741 S.W.2d 349 (Tex. 1987), the Court held that providers of services are also subject to the requirements of the DTPA. There is clearly some evidence to support the jury's answers to each of these questions, thus Geo Viking's no evidence point must fail.

■ Geo Viking next contends that the trial court erred in overruling its objections to the submission of the question on damages and in entering judgment based thereon because there was no evidence to support the jury's answer. Once again, Geo Viking repeats its argument that there is no evidence that Tex–Lee sustained any damages. It then argues that it was impossible to determine what the fair market value of the oil and gas reserve would actually have been. The plaintiff can satisfy this burden through the introduction of evidence showing the initial and continued production of wells drilled on the lands in controversy (if available) and on other lands in the immediate area. *County Management, Inc. v. Butler*, 650 S.W.2d 888 (Tex.App.—Austin 1983, writ dism'd by agr.); *Taubert v. Earle*, 133 S.W.2d 145 (Tex.Civ.App.—Fort Worth 1939, writ ref'd).

■ Tex–Lee's expert, Marek, testified at length about his expertise in the area of oil and gas projection reservoir studies and economic analysis of oil and gas properties, including wells in this particular field. He testified about the numerous wells within a one-half and a one mile radius of White # 1 and used an accepted method of analysis, the analogy method, to determine the probable reserves available at the point where this well was drilled. He also used the logging information from this well in creating his analysis. This is some evidence to support the jury's verdict.

Geo Viking also complains that Marek did not take into account whether the other comparable wells were stimulated by acidizing or fracing. He testified that if any of these wells had not been fraced, their production was lower than it might have been otherwise, which would serve only to lower his determinations about the size and volume of the field. Thus, any error in such a comparison could only fall in Geo Viking's favor.

■ In connection with this same point, Geo Viking also contends that an improper measure of damages was provided for the jury when Marek used oil prices as they were projected in 1984 to increase rather than using the actual (much lower) oil prices that existed between 1985 and 1989. Marek's testimony on this point was severely attacked on cross-examination. Marek testified that the total loss to Tex–Lee was in the neighborhood of $1,000,000, using these inflated oil price figures as a part of his basis for calculation. The jury found in Tex–Lee's favor on all counts, but only found actual damages of $300,000. A jury's verdict on damages cannot exceed the amount shown by the evidence, but a jury can reduce the amount below the opinion of an expert when there are factors that would justify such a reduction. Thus, there is some evidence to support the jury's verdict in this matter. Accordingly, these points of error are overruled.

Geo Viking next contends that the trial court erred in refusing to include its requested instruction which would have told the jury not to consider or include the value of any oil and gas reserves outside the actual eighty-acre unit. Geo Viking argues that Tex–Lee had no right to obtain any oil

---

1. "Good and workman-like" was defined as that quality of work performed by one who has the knowledge, training or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work.

and gas outside the unit and that the frac job, if completed as designed, would have extended beyond the unit. Therefore, it argues that Tex–Lee had no right to recover some of the oil which would presumably have been available as a result of the well completion.

■ This argument is in direct opposition to the rule of capture. This rule permits the owner of a tract to drill as many wells on his land as the Railroad Commission will allow and provides that he is not liable to adjacent land owners whose lands are drained as a result of his operations. The remedy of an injured land owner under such circumstances is generally said to be self-help. *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (1935). This point is without merit.

Geo Viking next contends that the trial court erred in entering a judgment for "additional damages" because there is no evidence that any act knowingly committed by Geo Viking constituted the breach of a legal duty that was the cause of actual damages to Tex–Lee. This point of error is repetitive of other points previously discussed. No additional argument is made or cases cited in Geo Viking's brief. This point is overruled.

■ Geo Viking next contends that the trial court erred in awarding pre- and post-judgment interest. Where damages are established as of a definite time, and the amount thereof is definitely determinable, prejudgment interest is recoverable as a matter of right from the date of the injury or loss. *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 96 (Tex.1976), *overruled on other grounds, Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). There is no argument about the date that the frac job was aborted, thus prejudgment interest was properly rendered from the date of the occurrence.

■ In the next portion of this argument, Geo Viking contends that the post-

judgment interest awarded by the court should not have been compounded. Article 5069–1.05, § 3(a) of Vernon's Revised Civil Statutes as it existed prior to amendment in 1987 stated that "except as provided by subsection (c) of this section, judgments earn interest for the period beginning on the day the judgment is rendered and ending on the day. the judgment is satisfied." [2] Geo Viking's contention on this point is correct. Later revisions of Article 5069–1.05 have provided that post-judgment interest should be compounded annually, but these amending statutes on their face do not apply to an action filed before their effective date. The award of ten percent judgment interest compounded annually is changed to reflect an award of ten percent simple interest on the judgment as was proper under the law prior to the amendment of the statute. *Mercantile Bank & Trust v. Cunov*, 749 S.W.2d 545, 550 (Tex. App.—San Antonio 1988, writ denied).

As reformed, the judgment of the trial court is affirmed.

CORNELIUS, Chief Justice, concurring on Motion for Rehearing.

I do not believe the court erred in refusing Geo Viking's requested instruction. If Geo Viking is responsible for depriving Tex–Lee of production, it cannot defend on the basis that Tex–Lee might have secured some of that production by trespassing on someone else's land. That is a matter between Tex–Lee and the other landowner. It is against public policy for a wrongdoer to escape liability for his wrongful act by showing that the injured party had an imperfect or defeasible title to the property which was taken or damaged.

GRANT, Justice, Dissenting on Motion for Rehearing.

I have changed my view on what the outcome of this case should be, but because my first opinion was so persuasive and

---

**2.** Article 5069–1.05 of Vernon's Revised Civil Statutes provides specific information about the method of interest that should be applied to a given situation. The authorizing statute states that "this Act applies only to: (1) an action

commenced on or after the effective date of this Act...." This action was filed on August 14, 1985. Thus, the 1987 amendments to the article should not be considered in determining the proper computation of interest.

well-reasoned, the other two judges of this Court continue to embrace the holdings in the initial opinion. While the initial opinion is essentially correct in the issues covered, Geo Viking correctly points out in its motion for rehearing that we did not fully address its point of error on the failure of the trial judge to instruct the jury on the proper measure of damages. It discussed only the rule of capture and not the problem of obtaining minerals by trespassing. An examination of this issue leads to a different disposition of the case; therefore, I respectfully dissent.

Geo Viking complained that the trial court erred in failing to give a limiting instruction to the jury that it was not to consider as a part of damages oil and gas that was obtained by fracing beyond the boundary of the unit owned by Tex–Lee. Geo Viking requested the following instruction, which was refused by the court:

> In answering Question No. 5, you shall not consider or include the value of the oil and gas reserves, if any, outside the 80 acre unit that would have become recoverable from the White 1 well because of any fracing beyond the boundaries of such unit. In other words, in estimating the value of such oil and gas reserves, if any, you shall consider only those reserves that would have become recoverable as a result of fracing within the boundaries of the lease in question.

This instruction was requested in conjunction with the damage issue, and Geo Viking has a specific point of error on appeal complaining about the court's failure to submit that issue.

Geo Viking takes the position that the measure of Tex–Lee's damage to properly sandfrac the well would only be the loss of the oil and gas that Tex–Lee could *legally* obtain through that process. Geo Viking contends that to the extent that oil and gas were obtained by trespass when the fracing process went under the land of other property owners, Tex–Lee could not claim that portion of oil and gas as damages.

Tex–Lee contends that Geo Viking should have raised this in its pleadings as an affirmative defense of illegality of contract pursuant to TEX.R.CIV.P. 94. I disagree. Geo Viking is not contending that the contract is unenforceable because it was illegal or against public policy, nor has it taken the position that any portion of the contract is invalid for illegality.

The rule of capture provides that the owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, even though such oil and gas has migrated from adjoining lands. *Halbouty v. Railroad Commission,* 357 S.W.2d 364 (Tex.1962). However, the rule of capture is permissible only "so long as the producing well does not trespass." *See* Williams & Meyers, *Oil and Gas Terms,* 869 (7th ed. 1987).

In dictum,[3] the Texas Supreme Court stated that fracing under the surface of another's land constitutes a trespass. *Gregg v. Delhi–Taylor Oil Corp.,* 344 S.W.2d 411 (Tex.1961). The Court in *Gregg* pointed out that fracing under another person's lands had all the necessary elements to be a trespass and found that it was comparable to slant-well drilling that bottomed on a neighboring tract, which the court had found to be a trespass and subject to injunctive relief in *Hastings Oil Co. v. Texas Co.,* 149 Tex. 416, 234 S.W.2d 389 (1950). We agree that Tex–Lee could not claim as damages loss of oil and gas to which it was not entitled.

Although TEX.R.CIV.P. 277 gives the court discretion to submit issues broadly, this discretion is not boundless. *Johnson v. Willis,* 596 S.W.2d 256, 262 (Tex.Civ. App.—Waco 1980, writ ref'd n.r.e.). Damages must be measured by a legal standard which serves to guide the factfinder in determining the amount of compensation required. The proper measure of damages is a question of law for the court but the charge should limit the jury's consideration to facts that are properly a part of the damages allowable. *Mangham v. Hall,*

---

**3.** These statements in *Gregg v. Delhi–Taylor Oil Corp.,* 344 S.W.2d 411 (Tex.1961), are dicta, because the issue decided by the court was wheth-er the Railroad Commission or the District Court has jurisdiction in the case.

564 S.W.2d 465, 468 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). The charge to the jury must be sufficient to enable the jury to make an assessment of damages on proper grounds and proper legal principles. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87 (Tex.1973). There was evidence stating that the fracing process went more than 2,500 feet from the well site, which was far beyond the boundaries of the unit and outside the leasehold, and that it should have gone another 1,000 feet so that it could have intersected one of the major faults. Thus, the jury had before it evidence upon which it may have based all or a portion of its damages for a loss in oil and gas to which Tex–Lee was not legally entitled to obtain. Pursuant to TEX. R.APP.P. 81, I have determined that this error was reasonably calculated to cause and did cause the rendition of an improper judgment.

The judgment of the trial court should be reversed, and the case remanded for a new trial.