## MILLER v. RAILROAD COMMISSION OF TEXAS et al.

### No. 9466.

Court of Civil Appeals of Texas. Austin.

Jan. 17, 1945.

Rehearing Denied Feb. 7, 1945.

224

Pollard & Lawrence, of Tyler, for appellant.

Grover Sellers, Atty. Gen., and Geo. W. Barcus and Harris Toler, Asst. Attys. Gen., for appellee Railroad Commission of Texas.

Walace Hawkins, of Dallas, and Dan Moody and J. B. Robertson, both of Austin, for appellee Magnolia Petroleum Co.

BAUGH, Justice.

A Rule 37 case. Appellant applied to the Commission for permits for well No. 2 on a .81-acre tract, and for wells 9 and 10 on a 4.18-acre tract, both tracts situated within the city limits of Kilgore, Texas. Both applications were denied, separate suits filed thereon in the District Court of Travis County, which suits were consolidated, tried without a jury, and the action of the Commission upheld; hence this appeal.

The sole contention made by appellant is that the courts and the Commission in determining whether drainage and confiscation exist as to a given tract of land, the underground conditions being uniform, have adopted as a rule of comparison, the density of drilling in the eight times area surrounding such given tract; and that to deny the appellant the opportunity to drill his leaseholds to such overall average density, and thus put his production on a parity with adjacent leases, would be discriminatory against him and amount to confiscation of his property.

The underground conditions in the areas involved were admittedly uniform and the per well allowables were the same. Nor is it contended that the wells applied for were needed to prevent waste.

At the outset it is contended by appellees that appellant did not show ownership in all of the surface area delineated in his application to the Commission. This for the reason that as to the .81-acre tract the map accompanying his application shows merely surface area but no streets; whereas the map of the City of Kilgore, introduced in evidence, and the testimony, shows that said tract is divided into lots which abut upon streets along the southwest, the southeast, and perhaps the northeast; and that it was not shown whether in computing the .81-acre area appellant had included therein the area extending to the center of such streets, as he did in computing the area of the 4.18-acre tract. Obviously, if one-half of the width of streets on two, or perhaps three, sides of such tract were included in computing an area aggregating only .81 of an acre, the exclusion of such street surfaces would materially reduce the size of such tract as a basis for comparison with the eight times surrounding area. As to the 4.18-acre tract, treated by appellant as a single tract, the record affirmatively shows that it is in reality composed of two separate tracts. The one to the southeast consisting of a city block, subdivided into eight lots, which block is bounded by four streets,—those on the southwest, southeast and northeast being 50 feet wide; and that on the northwest, which separates this tract from the other portion of the 4.18 acres, being 60 feet wide. In computing the area of the two combined tracts, considered by appellant as one tract of 4.18 acres, appellant included therein one-half of the area of the three streets to the southwest, southeast, and northeast of the city block, all of the 60-foot street to the northwest thereof, and one-half of the street to the southwest of such other tract. Obviously if the surface areas of these streets be excluded the size of the so-called 4.18-acre tract would also be materially reduced, an important factor in comparing it with the eight times surrounding area in determining relative density.

If the City of Kilgore did not own title to its streets, but only an easement

over the properties traversed, then the title to the abutting properties extended to the center of such streets, subject only to such easement. 39 Tex.Jur., § 51, p. 584. If, on the other hand, the city had acquired, either by purchase or condemnation, title in fee to its streets, then the abutting property owners had no interest therein other than that of the general public. Town of Refugio v. Strauch, Tex.Com. App., 29 S.W.2d 1041; 39 Tex.Jur., § 53, p. 588. There was no proof offered in the instant case as to such ownership, one way or the other.

However, in view of the general rule announced in 39 Tex.Jur., § 51, that unless otherwise declared in the grant, title to property abutting on a street extends to the center thereof, we will assume for the purposes of this opinion that appellant's leasehold included the lands within the boundaries laid out by him.

The spacings provided in Rule 37 at the time appellant's applications were denied by the Commission were 467 ft. from property lines and 933 ft. between wells, or one well to 20 acres. The circular eight times area—33.44 acres—surrounding the 4.18-acre tract, excluding said tract and the eight wells already thereon, contained 89 wells, or a density of .38-acre per well; as against a density on said 4.18-acre tract of .52-acre per well. The two wells applied for would give said 4.18-acre a density of approximately .42-acre per well, still less than the adjacent eight times area. The .81-acre tract had only one well, as against 15 on the circular eight times surrounding area of 6.48 acres, or an average density thereon of .52-acre per well. The additional well on this .81-acre tract would give it a density of .40-acre per. well thereon, greater than the average density for that eight times area.

Other than stipulations and documentary evidence only one witness testified, a petroleum engineer called by the appellant. His testimony shows that the Kilgore townsite, because of the diversity of ownership of numerous small tracts, had been drilled to a far greater density than the rest of the East Texas field, in one section of the townsite there being 400 wells on a contiguous 100 acres, and in one locality a density of as much as 20 wells to one acre. The water table pressure is from the west, which, combined with the excessive withdrawals on the townsite area and consequent low pressure there created, caused an excessive migration of oil eastward, prematurely drowning out wells to the westward. There was no local uncompensated net drainage as between appellant's tracts and the other tracts in the surrounding eight times area. At the time the permits here involved were denied all of said tracts, due to migration of the oil from west to east, had as much oil beneath them as was originally in place thereunder, and will continue to have as much until the oil in the sands in that section is replaced by the approaching water table; a period estimated, if present conditions continue, to be from 25 to 30 years. Said witness also testified that appellant had already recovered approximately twice as much oil as was originally in place beneath each of said tracts; and that if present conditions continue he will, without additional wells, recover within the next 20 years approximately six times the amount of oil originally in place beneath the 4.18-acre tract; and approximately five times the amount originally under the .81-acre tract. Also that had the Kilgore townsite been drilled to the average density of the area to the west (approximately one well to 3 acres) the migration of oil eastward would have been much retarded and appellant would ultimately by virtue of such migration have recovered only 1½ to 2 times the amount of oil originally in place beneath his leases.

The average density of the eight times surrounding area, as compared to a given area, has never been accepted as a conclusive criterion on the issue of drainage and confiscation. It is at most but evidentiary and can give no vested right in a given producer to drill a given tract to such density. Its value as evidence on a confiscation issue is necessarily dependent upon at least three factors: 1. The size of the eight times area; 2. The location of the wells in such area; and 3. Whether such wells cause local uncompensated drainage as between the adjacent tracts in the area. Obviously, if in a given area delineated by a circle, the major portion of the total number of wells within it are located in a single segment, composing for example only 1/4 of the circle, mere numbers would afford no reliable criteria of density for the entire area. Hence density based purely on numbers in an overall area may or may not be of value on the issue of drainage to or from a given tract. Further, density within such eight times area as a criterion has been applied only

to instances of local drainage, and not to regional migration in the field as a whole.

■ No such uncompensated drainage from one tract to an adjoining tract of the oil thereunder was shown in the instant case. On the contrary, all oil extracted from all wells in this area was replaced, not by local drainage, but by the general migration of oil from the west. But appellant contends that he was entitled to drill enough wells on his tracts of land to place him on a parity with his neighbors in capturing this migratory oil from the west which flowed to his lands under natural laws, and that to deny him such right amounted to a discrimination against him; relying particularly on Atlantic Oil Production Co. v. Railroad Comm., Tex.Civ. App., 85 S.W.2d 655; Gulf Land Co. v. Atlantic Ref. Co., 134 Tex. 59, 131 S.W.2d 73; Railroad Comm. v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022; and Railroad Comm. v. Magnolia Pet. Co., Tex.Civ.App., 169 S. W.2d 253.

By the term natural drainage as used in the Atlantic and Magnolia cases, supra, was meant such migration of oil under natural laws resulting from an orderly development of the field under the pattern prescribed by the Commission. The development of the Kilgore townsite area was far from orderly and entirely out of proportion to the area to the west of it. While the movement of the oil from the west into the low pressure area was the result of natural laws, the conditions (excessive drilling) in the area which set such laws in motion were man made, abnormal, and different from other areas of the field. The net result of the situation created in the Kilgore townsite by such extreme density of drilling is to enable all producers in that area, through resulting accelerated migration of oil, to recover ultimately far more oil than they would or could have recovered had it been developed on a comparative density with the lands to the west. It may also be conceded, as the instant case illustrates, that a disparity or inequity as between producers in the area will result, unless reasonably uniform density of drilling in such entire area is allowed; but to sustain appellant's contention, and to permit same as a matter of right, would authorize the drilling, ultimately, of the entire townsite to the density of the smallest tract therein (shown to be .05-acre per well), and then the expansion, by a similar process, of such drilling pattern to the entire field, thus obviously nullifying Rule 37 as a conservation measure. Already this particular area had a decided advantage over the lands to the west, and the Commission was confronted with the problem of whether to aggravate this condition by attempting to equalize production within the area, to the injury of producers to the west; or to cause waste and create further discrimination against producers to the west by permitting still further excess drilling in the townsite area. If it be conceded that, under existing facts, discrimination, as considered in Gulf Land Co. v. Atlantic Ref. Co., 134 Tex. 59, 131 S.W.2d 73, would result, whichever way the Commission resolved the question; it was for the Commission to determine which course would best conserve the natural resources of the State.

Nor is this case ruled by Railroad Comm. v. Magnolia Pet. Co., Tex.Civ.App., 169 S. W.2d 253. The rule announced in Byrd v. Shell Oil Co., Tex.Civ.App., 178 S.W.2d 573, is, we think, here controlling. The decision in Magnolia case was based on uncompensated net local drainage as between adjoining tracts in the given area. In the instant case excess local drainage from one tract as such to another tract as such was not shown. On the contrary all of the oil originally in place had already been produced from all of said tracts. And regardless of the density of a given tract, or the amount of production therefrom, all of such oil was replaced, not by local drainage, but by the general regional migratory movement from the west, which flowed into all wells alike regardless of local density. Thus, as stated in the Byrd case, the situation presented is a general condition for solution by the Commission, not applicable alone to a particular tract, or to a particular area, in this section of the field; and not one to be solved by exception as to a particular tract in the affected area.

It follows therefore that the judgment of the trial court should be affirmed, and it is so ordered.

Affirmed.