**AMOCO PRODUCTION COMPANY,**
**Appellant,**

v.

**John ALEXANDER et al, Appellees.**

**No. 17367.**

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Nov. 15, 1979.

Rehearing Denied Dec. 20, 1979.

468

McGinnis, Lockridge & Kilgore, Robert C. McGinnis, John Stayton, Austin, Dean Capp, James D. Klutz, Houston, for appellant.

Scott & Douglass, Thomas M. Reavley, Austin, for appellees.

Before COLEMAN, C. J., and PEDEN and DOYLE, JJ.

DOYLE, Justice.

This is an appeal from a judgment based on a jury verdict wherein royalty owners John Alexander, et al (the Alexanders) recovered $3,916,659 in actual and exemplary damages from Amoco Production Company (Amoco) for its failure to perform as a

reasonably prudent operator under certain lease agreements, thereby causing permanent drainage loss of otherwise recoverable oil from the leased premises. Amoco principally contends that the drainage was field-wide rather than local and that under its lease agreements with the Alexanders, it is under no legal obligation to prevent such drainage.

We reform and affirm.

The Alexanders are owners of a ⅙th royalty interest in each of three oil and gas leases executed to Amoco for production operations in the Hastings West Field, Brazoria County, Texas. The three leases include an "A lease" of 60 acres, a "B lease" of 40 acres and an additional 10 acre lease. Amoco represented to the Railroad Commission as well as stipulated for purposes of this litigation that the said 10 acre lease is a part of the 70 acre "A lease", and this court will disregard any contention to the contrary. Six oil wells are located on the "A lease," four on the "B lease" and one on the 10 acre lease. The Alexanders sued Amoco for breach of contract for failure to operate these leases in a prudent manner and thus protect them from drainage. The Alexanders further contended Amoco deliberately operated these and other nearby leases so as to intentionally cause said drainage, thereby maximizing Amoco's own profits. Amoco is the leasehold owner of 80% of the entire Hastings West oil field. The oil producing formation in this field rises in elevation from northwest to southeast. This field is classified as an active water-drive field, meaning that as the oil is pumped out, it is replaced by water lying below the oil which drives the oil forward and up through the layers of sand. Since the Alexanders' lease is in the northwestern most location, whatever oil Amoco is unable to withdraw at this location, it will eventually recoup as it moves to its other leases in the southeast locations. There is also evidence that Amoco deliberately set out on a "plug-back" program to draw as much oil from the northwest location of the field to the southeast part of the field in an effort to drive out Exxon Corporation, a major competitor. This plug-back program began in 1969, but this case is limited to the time periods from 1972 on the contract theory of liability and from 1974 on the tort theory, so any discussion of the plug-back program will be limited to this time frame. The Alexanders contend that because Exxon's wells are situated upfield from the Alexanders, but downfield from Amoco, as Amoco continued this program it not only crippled its competitor, Exxon, but virtually destroyed any oil production on the Alexanders' leases. In 1973, John Alexander wrote a letter to Amoco complaining of the dramatic decrease in production on the 70 acre "A lease" and requested that corrective work begin immediately. Amoco replied stating, "We have reviewed all of our wells for possible corrective work and economics do not justify the additional expenditures." Further, the Hastings West field is an M.E.R. (maximum efficient rate) field. As a well is unable to produce its allotted share, such share is then assigned to other wells in the field.

Testimony at the trial included two expert witnesses, called by the Alexanders, C. Ronald Platt and Max Powell, who testified to the amount of oil under the litigated leases, prudent production on these leases, and damages. Amoco called its expert witnesses in rebuttal to the testimony offered by the Alexanders. Sixteen special issues were submitted to the jury who rendered a verdict against Amoco on the contractual and tort theories of liability.

The voluminous record before us consists of three volumes of technical exhibits, four volumes of transcripts, and five volumes of statement of facts.

Amoco's appeal is predicated upon thirteen points of error, the first two of which complain of the trial court's errors in failing to grant its motion for an instructed verdict because it had no duty to prevent field-wide drainage which the evidence established and of the trial court's admission of evidence on its obligation to drill additional wells and rendering judgment for damages for its failure to drill such wells.

Amoco has no dispute with the well-established proposition that a lessee owes a duty to his lessor to protect against drainage. Because of the nature of oil and gas and the likelihood of their being withdrawn by the operation of a well on an adjoining tract of land, even if there is no express covenant in a lease, the courts will imply such a covenant and impose a duty upon the lessee to protect the lessor from drainage. 2 Summers, Oil and Gas § 399 (1959), *United North & South Oil Co., Inc. v. Meredith*, 258 S.W. 550, Tex.Civ.App.-Austin 1923, aff'd 272 S.W. 124 (Tex.Com. App. 1925, judgment adopted). It is Amoco's contention that its duty arises only when a well is causing drainage on adjoining tracts of land, which the evidence failed to show. Amoco argues that because Hastings West is a water-drive oil field, Amoco has no control over the natural forces pushing the oil away from the Alexander's wells.

The testimony shows that the reservoir under the Hastings West field is tilted rather than horizontal, the highest portion of the reservoir being toward the Southwest and the lower portion extending toward the Northeast. The "water replacing oil" process occurring when oil is withdrawn from the reservoir forces or pushes the remaining oil higher up the tilted structure of the reservoir. Obviously the "down-dip" areas receive the water first and are thus "watered out" earlier. Wells located higher on the structure, or "up-dip" will therefore produce longer before "watering out" and recover more oil. The Alexander leases are "down-dip" from the other leases of Amoco, and there is no dispute that the total daily allowable for the Alexanders' four "B" lease wells dropped from 600 barrels in January 1972 to 35 barrels in August 1976. Amoco argues that the Alexanders are the unfortunate victims of natural circumstances common to any owners of down-dip leases in a water-drive field such as Hastings West and that it is not Amoco's duty or obligation to do anything to prevent the field-wide oil drainage made the basis of the Alexanders' suit.

Whether a lessee, in the absence of an express covenant, is under an implied duty to prevent field-wide drainage from its lessor's premises appears to be an issue of first impression in Texas. The litigants have cited no authorities directly in point on this issue and we have been unable to find any. Amoco also argues that if the Alexanders are to gain relief from their plight, the solution must come from the Railroad Commission.

In support of its argument Amoco has cited a number of cases dispositive of litigation growing out of applications to drill offset wells pursuant to Rule 37 of the Railroad Commission of Texas. *Byrd v. Shell Oil Co., Inc.*, 178 S.W.2d 573 (Tex.Civ. App.-San Antonio 1944, writ ref'd w. o. m.); *Miller v. Railroad Commission of Texas*, 185 S.W.2d 223 (Tex.Civ.App.-Austin 1945, writ ref'd); *Woolley v. Railroad Commission*, 242 S.W.2d 811 (Tex.Civ.App.-Austin 1951, no writ). Each of these cases resulted in a denial of applications for permits to drill offset wells in the East Texas Oil Field near Kilgore, Texas. In denying the drilling permits in each case, the appellate courts held, in summary, that the drainage complained of by the applicants arose from the excessive drilling of wells in the Kilgore townsite area and the granting of other applications would only further saturate the field with wells. In the *Miller* case, the court recognized that the East Texas field was water-driven and stated:

> While the movement of the oil from the west into the low pressure area was the result of natural laws, the conditions (excessive drilling) in the area which set such laws in motion were man made, abnormal, and different from other areas of the field.

The issue in each of these cases was not whether the applicants seeking permits were receiving their fair share of oil from their existing wells, but whether to grant them permits to recover more. In each case, the Commission found that the applicant had already produced his fair share or more of the oil beneath his land and that there were no conditions affecting the land which were peculiar to it and not shared by

surrounding tracts of land. In fact, in the *Miller* case, *supra*, at 225, testimony showed:

> . . . that appellant had already recovered approximately twice as much oil as was originally in place beneath each of said tracts; and that if present conditions continue he will, without additional wells recover within the next 20 years approximately six times the amount of oil originally in place beneath the 4.18-acre tract; and approximately five times the amount originally under the .81-acre tract.

In the case before us, we encounter none of the problems of spacing, density and waste which concerned the courts in the above-cited cases, which are distinguishable on the facts and law. The question of the duty of a lessee to protect against field-wide drainage never arose in any of these cases. The general rule in Texas and a majority of other jurisdictions is that the lessee must operate the lease in such a manner that loss or drainage of the oil from the premises is prevented, unless the parties have contracted otherwise. The lessee is liable for the total value of the royalty lost if the lessee fails to exercise ordinary care to protect the premises from drainage. The standard of care required of the lessee in the operation of existing wells and the drilling of offset wells is that of a reasonably prudent operator. *Texas Pacific Coal and Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031 (1928); E.O. Kuntz, Thornton on Oil and Gas, § 166 (Cum.Supp.1960). In 2 Summers, Oil and Gas, § 414 (1927) it is stated:

> The courts usually hold that it is sufficient to establish a breach of the covenant to protect from drainage, if the lessor alleges and proves such facts and circumstances that a reasonably prudent operator, with full knowledge of all of such facts and circumstances, in the exercise of ordinary care, would have thought that substantial drainage was taking place and have drilled offset wells with the reasonable expectation of producing oil or gas therefrom in paying quantities.

The unusual facts in this case show that the Hastings West oil field began production from the heavily laden oil sands in its reservoir in 1934 and today it is producing 75,000 barrels of oil daily. It appears that prior to 1969 Amoco followed what has been termed "the standard practice" of producing from the lowermost sand in the reservoir first and then "plugging-back" to successively higher sands as the portion of the well bore penetrating the lower sand became watered out. However, beginning in 1969, Amoco began a large-scale operation of "plugging-back" all of its wells to the highest sand member, so as to make greater oil withdrawals in the A–1 sand member and thus shorten the life of the Exxon leases by pulling the oil up-dip faster. Although Amoco owned 80% of the leases in Hastings West field, Exxon was its chief competitor and evidence was adduced that Amoco was intent on improving its competitive position. By Amoco's newsletter referring to its improvement over 1971 allowables, its policy is clearly revealed.

> The continued increase in Amoco's share of the total field allowable can be attributed to producing policies initiated to insure optimum withdrawals from competitive zones while maintaining maximum oil producing rates at minimum lifting costs. These policies, supplemented by plugback programs, have been instituted previously in all areas of the field containing competitive leaseholds. Continuation of the current policy is expected to result in further improvement in Amoco's share of the total filed allowable. The current producing policy was placed in effect in 1969.
>
> Preparations for an M.E.R. increase are active.

The end result of Amoco's policy was to greatly accelerate the up-dip drainage of oil not only from Exxon's leases but most certainly from the Alexander leases which were further down-dip than those of Exxon. Exxon was able to protect its leases to some extent by applying for and obtaining Rule 3 exceptions from the Texas Railroad Commission for replacement wells at points highest on the structure. In its findings of fact on one of Exxon's applications heard on July 9, 1975, the Commission stated:

The workover procedure performed by Amoco on 23 wells accelerated the water movement in this reservoir and is watering out the Alexander lease (Bell H. Alexander lease) at a rate of 60 feet of structure per year . . . (parenthesis ours)

Then followed the conclusion of law:

Based on the fact that this replacement is located on the same proration unit as the well to be replaced, and that the proration units are reasonable, and the fact that the water movement has been accelerated by Amoco workovers, and the fact that oil is moving off this lease at the rate of 60 feet of structure each year, the location is necessary to prevent confiscation . . .

▆ Whether Amoco has operated the Alexanders' leases as a reasonably prudent operator would have been expected to do must be judged in the light of the facts, circumstances and surrounding conditions shown by the evidence to have existed in the Hastings West field during the relevant time period. Under these facts, is Amoco's duty limited to only the implied covenant to protect against drainage caused by wells located on tracts adjacent to the leased premises? We have found no legal authority for such a limitation. We think that Amoco was under an implied duty to protect the Alexanders' leases from local and field-wide drainage. What difference does it make if the drainage is local or field-wide when the facts show, as they do in this case, that Amoco was giving nature a tremendous boost in causing the drainage of oil to accelerate up-dip away from the Alexanders' leases by its aggressive efforts to improve its competitive position in the field? By its field-wide activities, Amoco caused the loss of oil from the Alexanders' leases which a prudent operator would have recovered, and hence is liable for the value of such lost oil.

Amoco also relies on the 1940 lease agreements with the Alexanders to relieve it from the obligation to prevent drainage by drilling offset wells. Whatever language these agreements contained pertaining to development and offsets, they do not limit or restrain the implied covenant to protect against drainage, which is a separate and distinct covenant from that of reasonable development. Merrill, Covenants Implied in Oil and Gas Leases § 94 (2d ed. 1940) p. 234. Texas courts have followed this rationale:

It is true that drilling an offset well is in a sense developing the property. But the implied covenant to drill offset wells for protection of the property from drainage is a distinct obligation from the obligation imposed by the implied covenant to develop the property. They are two separate and distinct covenants. The express stipulation against, or the full performance of, the obligation of the lessee to develop the property will not relieve the obligation to prevent drainage. *Stanolind Oil & Gas Co. v. Christian*, 83 S.W.2d 408, 409 (Tex.Civ.App.-Texarkana 1935, err. ref.); *Wes-Tex Land Company v. Simmons*, 566 S.W.2d 719, 721 (Tex.Civ. App.-Eastland 1978, writ ref'd n. r. e.).

While Amoco argues that the 1940 agreements relieve it of the obligation to drill additional wells on the Alexander leases, the Alexanders deny that this is their contention. Their complaint is that Amoco did not prudently maintain the number of producing wells originally provided and already drilled so as to lessen the drainage of oil away from their leases. This, the Alexanders submit, could have been achieved by reworking some of the wells and replacing others. No additional wells would have been necessary.

To support their contention that Amoco is obligated to protect against drainage caused by its own acts upon other leases in the field, the Alexanders rely upon the Texas Supreme Court holding in *Shell Oil Company v. Stansbury*, 410 S.W.2d 187 (Tex. 1966). In that case the court specifically implied a duty on the lessee although express covenants in the lease relieved it of any liability when the lessee drilled a well on an adjoining lease causing drainage of its first lessor's land. In a prior decision in *Hutchins v. Humble Oil & Refining Co.*, 161

S.W.2d 571 (Tex.Civ.App.-Galveston 1942, writ ref'd w. o. m.), an appellate court had held that an express covenant limiting the lessee's liability for permitting drainage is effective according to its terms even where the lessee himself is causing the drainage. The *Stansbury* case rejected this holding in the following language:

> We approve the holding that Stansbury was entitled to recover damages from Shell upon proof that Shell caused substantial drainage of the lessor's lands, and that a reasonably prudent operator would have drilled a well on the Stansbury land to protect it from drainage. *Hartman Ranch Co. v. Associated Oil Co.,* 10 Cal.2d 232, 73 P.2d 1163 (1937); Meyers and Williams, Implied Covenants in Oil and Gas Leases: Drainage Caused by the Lessee, 40 Texas L.Rev. 923, 939–940 (1962). We disapprove any language in the opinion of *Hutchins v. Humble Oil & Refining Co.,* 161 S.W.2d 571 (Tex.Civ.App.1942, writ ref. w. o. m.) which conflicts with the principle that a lessee is under a duty to protect his lessor against depletion of the lessor's minerals by the affirmative act of the lessee upon adjacent land.

■ The record before us furnishes ample evidence to support the jury finding that Amoco followed an "intentional policy" of "increasing the drainage of oil by means of Amoco's operation on its other leases in the field." We hold that Amoco may not conduct its operations so as to produce a draining force on the entire reservoir in which it owned 80% of the leaseholds and retain a contract right to impose the loss upon the Alexanders by its operation of their leases. The 1940 leases granted Amoco no such contract right. *Stansbury,* supra; *Cook v. El Paso Natural Gas Company,* 560 F.2d 978 (10th Cir. 1977); *R. R. Bush Oil Co. v. Beverly-Lincoln Land Co.,* 69 Cal.App.2d 246, 158 P.2d 754 (1945); *Millette v. Phillips Petroleum Co.,* 209 Miss. 687, 48 So.2d 344 (1950); *Williams v. Humble Oil & Refining Company,* 432 F.2d 165 (5th Cir. 1970); Merrill, Covenants Implied in Oil and Gas Leases § 111 (2d ed. 1940) p. 260; 5 Kuntz, Oil and Gas, Rev. § 61.1 (1978) p. 138. Accordingly, Amoco's points of error one and two are overruled.

■ By its points of error three and four Amoco argues that the trial court erred in permitting testimony from two expert witnesses to the effect that Amoco was obligated to apply for permits to drill four additional wells at certain specified locations on the Alexanders' leases, and to further testify that the Railroad Commission would have granted exception permits to allow such drilling. In support of these contentions Amoco says that it has no duty to seek a Rule 37 exception from the Commission and that any expert testimony as to what the Commission would have done is speculative, a conclusion of law and an invasion of the province of the jury.

As stated earlier in this opinion, there is an absence of Texas case authority on some of the points involved. Hence, it has become necessary to consult authorities from other jurisdictions and treatises by legal scholars in the field of oil and gas law.

The undisputed evidence shows that oil was being drained from the Alexanders' leases in great quantities. Amoco used the best equipment available in its field operations and testified that such operations were fully automated with "a pretty sophisticated system" that allowed Amoco to check daily to see how a well was performing. In response to a question by Alexanders' counsel as to whether such system "would permit Amoco, if a well started making water and going below its allowable, to immediately analyze it and see if something couldn't be done to increase production?", Amoco's Mr. Brown answered, "Yes, sir." Thus, it is clear that Amoco was in a position to know exactly what was happening as to drainage or any other condition on the Alexanders' leases at all times. Under the leases in question Amoco had the exclusive right to drill and otherwise operate the leases. It would know almost exclusively whether and when to apply for relief from the Commission, armed as it was with all of the relevant data.

The rule of the Railroad Commission on well spacing in the Hastings West field provides:

Rule 1. No well for oil or gas shall hereafter be drilled nearer than six hundred sixty (660) feet to any other completed or drilling well on the same or adjoining tract or farm, and no well shall be drilled nearer than three hundred thirty (330) feet to any property line, lease line, or sub-division line; provided that the Commission in order to prevent waste or to prevent the confiscation of property will grant exceptions to permit drilling within shorter distance than above prescribed whenever the Commission shall determine that such exceptions are necessary either to prevent waste or to prevent confiscation of property. When exceptions to such rule are desired application therefor shall be filed with the Commission fully stating the facts, which application shall be accompanied by a plat drawn to the scale of 1″ equalling four hundred (400) feet, accurately showing to scale the property on which permit is sought to drill a well under the exception to this rule, and accurately showing to scale all other completed drilling and permitted wells on said property; and accurately showing to scale adjacent surrounding properties and wells. Such application shall be verified by some person acquainted with the facts, stating that all facts therein stated are within the knowledge of the affiant true, and that the accompanying plat is accurately drawn to scale and correctly reflects all pertinent and required data. Such exceptions shall be granted only after at least ten (10) days notice to all adjacent lessees affected thereby has been given, and after public hearing at which all interested parties may appear and be heard after the Commission has determined that an exception to such rule is necessary either to prevent waste or to protect the property belonging to applicant from confiscation. (Order of May 8, 1935)

Once Amoco had determined that the Alexander leases were watering out, prudent operation demanded that the oil drainage loss be curbed by drilling replacement wells higher on the structure unless such procedure would be economically unfeasible. If exceptions to the spacing rule were required, Amoco should have initiated the proper steps to obtain them in furtherance of its duty to prudently operate the subject leases. Since Amoco failed to do this, the Alexanders were entitled to show that the exceptions most likely would have been granted under the fact situation here existing, and they suffered damages because Amoco failed to do so. Professor Merrill in 9 Okla. Law Review 125 (1956), at p. 127–128 discusses how the lessor (Alexanders) may prove that an exception to the spacing rule could have been obtained by the lessee (Amoco):

> How is the plaintiff to meet this requirement? Obviously, the answer is that he does so by the same sort of proof which he uses to establish his prima facie case in the absence of conservation laws. He shows the physical facts which describe the characteristics of the area and suggest the different exploitation would yield a more lucrative harvest. By expert testimony, he brings before the tribunal the scientific grounds in support of this conclusion. By the same type of testimony he establishes that the change in rule which he contends should have been made either is both practicable and consistent with the policy and the text of the conservation laws . . .
>
> Take first a simple case of drainage, which might arise because of well-spacing requirements in a jurisdiction where a regulation similar to the famous Texas Rule 37 prevails. Assume the existence of a tract of five acres which, by the jurisprudence developed under this rule, would qualify for a wellsite under the confiscation exception to the rule. Assume further, however, that the tract is under lease to an operator who holds also the lease upon the remaining 15 acres in this unit, and has completed a well thereon. The lessee, producing oil from the entire area through his one well, does not apply for permission to drill upon the five-acre tract. The lessor sues for relief on the ground of a breach of the implied covenant to protect against drainage. As

part of this case, he must produce testimony showing the lessee's inaction, the physical conditions in the field, the existence of draining from beneath his tract to the existing well, the probable productivity of a well upon his tract, and the facts which justify the granting of an exception under the confiscation rule. Thereby he establishes, prima facie, a breach of duty by the lessee, stemming, in part, from failure to make the necessary application to the administrative body.

Similarly, if we increase the size of the tracts of the well-spacing, we may envision a situation to which the theory of confiscation might not apply, but in which expert testimony might show that the objective of conservation could be accomplished as well, perhaps better, by a closer pattern of spacing, so as to give the lessor more wells. It might be shown, even, that this would give access to oil, not recoverable with wider spacing. In such a case the relief would be sought on a theory of a breach of the covenant for further development rather than of that for protection.

Another eminent oil and gas writer, Professor Charles J. Meyers in The Effect on Implied Covenants of Conservation Laws and Practice, in 4 Rocky Mountain Mineral Law Institute 463, (1958), at p. 486 says:

In one instance the duty to fulfill implied covenants administratively is more complex. This occurs when the regulation bars performance of the covenants but provides for exceptions under certain circumstances. It could be argued that failure of the lessee to seek an exception is a breach of covenant. Professor Merill's paper does not go this far. He suggests rather that if the evidence shows the probability that an exception could be obtained, the lessee is liable for failure to conduct the operation permitted by exception. This position receives direct support in a case decided after Professor Merill's paper was published. The case is *Baldwin v. Kubetz*, decided by a California District Court of Appeal. The action was one for cancellation of a sublease by the sublessor against the sublessee, the grounds being failure to perform an express drilling obligation assumed by the defendant. The defense was inability to drill on the leasehold due to zoning restrictions which suspended the drilling obligation under a force majeure clause in the lease. The evidence showed and the court found that defendant could have obtained a variance under the zoning ordinance upon application.

The *Baldwin* case referred to in the foregoing excerpt is found in 148 Cal.App.2d 937, 307 P.2d 1005 (1957).

These legal scholars lend support to the Alexanders' position. Their expert witnesses, Max Powell and Ronald Platt, were qualified to testify as to field conditions existing at the A and B leases and the procedures and practices of the Railroad Commission. Both held engineering degrees and had worked in the field for a number of years. One had done extensive studies in the Hastings West field and the other had worked as an employee of the Commission. Both testified that great amounts of oil were being drained from the A and B leases and that a prudent operator would have drilled two replacement wells on each lease at the highest point in the producing structure. They further testified that although these new wells would be nearer the lease line than 330 feet, and closer to other wells than 660 feet, there would be no problem in securing the necessary exceptions as required by the quoted spacing rule. Amoco never tried to get any exceptions for the Alexanders' leases as a prudent operator would have done. Therefore, it was encumbent on the Alexanders to prove such facts as would warrant the granting of a Rule 37 exception. This they did through their experts, who, given such facts in hypothetical questions, gave the opinion that the Commission would have granted the application to drill the proposed wells. Amoco raises the point that the hypothetical questions were improper because they omitted the assumption that Exxon would have protested such applications if they had been made. No support for this contention appears in the record. On the

contrary the facts show that Exxon also needed replacement wells on its own leases and made several applications for them, all of which were granted by the Commission despite protests from Amoco. On the other hand Exxon did not protest any of Amoco's numerous applications for Rule 37 exceptions which it filed on behalf of some of its other leaseholds in the Hastings West field. Points of error three and four are overruled.

Amoco alleges in points of error five, six and seven that the trial court erred in failing to grant its motions for an instructed verdict and for judgment notwithstanding the verdict because there was no competent evidence to sustain the jury's finding and the court's judgment as to Amoco's liability, and that the experts' testimony invaded the province of the jury.

As previously pointed out in this opinion, Amoco represented to the Railroad Commission and stipulated at the beginning of the trial that the 10 acre lease was a part of the 70 acre A lease. We consider that issue as now settled. Likewise, we have considered the import and admissibility of the Alexanders' expert witnesses testimony touching upon the drilling of additional wells. Our discussion under these points will be limited to Amoco's liability and damages.

In arriving at the measure of actual damages awarded to the Alexanders, the expert witness found the royalty value of the oil that Amoco had actually produced from the Alexander leases during the period from November 1, 1972 to July 1, 1978, and then subtracted such amount from the royalty value of the oil that would have been produced during the same time span by prudent operation of the leases. The witness Ronald Platt examined the depths and production of all wells in the area of the Alexander leases. He then plotted what the prudent production for each Alexander well should have been based on the performance at the time of other wells in the reservoir located as low or lower on the structure as the particular Alexander well. Max Powell, the other Alexander expert, testified that such method of determining

prudent production was the accepted practice in the profession. Platt also stated that value of the lost production would be what the oil would have sold for on the free market at the beginning of the period and then the price that would have been obtained under the federal controls when that program became operative. From such expert testimony, accompanied and explained as it was by means of maps, charts, graphs and photos, the jury had an ample basis from which it could find both the amount of oil lost by imprudent production and its value. All authorities are in agreement that expert testimony, free of conjecture and speculation, is proper and necessary to determine and estimate damages in the highly specialized field of oil and gas.

> Thus, where breach of the covenant to protect is charged, it is not sufficient merely to prove that a well was drilled on adjoining land and that it produced oil; the lessor must also show that the well produced in paying quantities, that it actually drained a definite amount of oil, that an ordinarily prudent operator would have drilled on offset well, that such a well would have produced a definite quantity of oil, and that its operation would have resulted profitably to the defendant. . . . Circumstantial evidence is admissible in a suit of this kind. For example, the fact that the lessee holds a very large acreage of prospective oil land in the vicinity may be received as tending to show a motive for failure to develop. 42 Tex.Jur.2d, Oil and Gas § 261 (1963).

Expert witnesses may testify to prove that a well should be drilled or that drainage is taking place. In *Texas Pacific Coal & Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031 (1928), the Supreme Court stated:

> The rule which permits a lessor to recover damages for a lessee's breach of covenant to protect or develop oil or gas land rests on the assumption that it can be shown with reasonable certainty that the lessor has been deprived of the value of his portion of at least a certain quantity of oil or gas, worth a certain amount, which

the lessee would have produced had he exercised proper diligence. Summers' Oil and Gas § 139 p. 449.

The court continued, citing the case of *Blair v. Clear Creek Oil Company*, 148 Ark. 301, 311, 230 S.W. 286, 290, 19 A.L.R. 430:

Because the nature of the inquiry makes it practically impossible to ascertain with certainty the exact amount of the lessor's damage is no reason why the lessor should not have an action for damages for the breach of the implied covenant. It is true the law does not permit a witness to speculate or conjecture as to possible damages; yet experienced persons who are acquainted with the gas-bearing conditions of the lands in the locality of the leased premises can give an opinion as to the amount of gas drawn off the premises and lost by failure of the lessee to comply with its implied covenant. The rule is that, while the law will not permit witnesses to speculate or conjecture as to possible or probable damages, still the best evidence of which the subject will admit is reasonable; and there is often nothing better than the opinion of well-informed persons upon the subject under investigation.

■ The testimony of the Alexanders' expert witnesses, when viewed in its entirety, supplied the only detailed explanations of the operations and method of production affecting the subject leases on which the jury could base its findings. It is the function of the witnesses to supply the facts and interpret the technical data in such a manner as to be helpful to the jury in determining the ultimate issues. The caveat imposed upon such witnesses is that they refrain from giving an opinion in response to a question involving a legal definition and a conclusion predicated on such definition. To allow such an opinion could allow a witness to employ a term or require a standard different from that based on its legal meaning. This is pointed out in *Carr v. Radkey*, 393 S.W.2d 806 (Tex.1965), where the court was of the opinion expert witnesses may testify to ultimate issues if their testimony promoted understanding of the

issues and helped the jury to reach a decision, where to do so did not involve legal definitions, legal tests, or pure questions of law. Amoco cites our Supreme Court for authority holding that an expert may not express an opinion on the ultimate issues. *Snow v. Bond*, 438 S.W.2d 549 (Tex.1969). Unlike the case before us, the *Snow* case was a summary judgment proceeding wherein the court held that the conclusion of the affiants on lack of negligence and malpractice was not so conclusive as to carry the movant's summary judgment burden. In our case the concern is whether the Alexanders' experts could properly testify about the prudent operation of the leases and the standard practices as to how drainage losses of oil were determined and the value thereof fixed. This they were fully qualified to do and it was the jury's province to weigh, evaluate, believe or disbelieve this evidence and return its findings accordingly. *Carr v. Radkey*, supra. Amoco's fifth, sixth and seventh points of error are overruled.

■ Amoco's eighth point of error states that the trial court, over its objection, erred in admitting in bulk form miscellaneous documents, admissions, exhibits and answers to interrogatories.

Amoco cites the case of *Hurtado v. Texas Employers' Insurance Association*, 574 S.W.2d 536 (Tex.1978), in arguing that the material was wrongfully admitted. In the *Hurtado* case, the evidence introduced was medical records containing conclusions and hearsay which could greatly influence a jury or even constitute a basis for its decision. Exclusion of such evidence under those facts was proper. In the instant case the evidence included admissions and interrogatories of the parties of which both attorneys were aware. Amoco's counsel stated that the material was not relevant. The court made it clear that if either party sought to use any of the material in the course of the trial, an objection could then be interposed. There is no showing that the material contained any conclusionary or hearsay statements or that it influenced the jury's deliberations. We cannot say that

the admission of the material was prejudicial and probably caused the rendition of an improper verdict, so we hold that if error was committed, it was harmless. Rule 434, T.R.C.P. We overrule the point of error.

Amoco's points of error nine, ten and eleven are directed at the trial court's allowing the Alexanders to prove and recover exemplary damages; in refusing to grant a new trial because the exemplary damages were excessive and in instructing the jury not to consider the 1940 lease agreements in determining the exemplary damages issue.

Amoco's main contention is that a party cannot recover exemplary damages for the breach of a contract unaccompanied by a tort, even if the breach was accompanied by malice. Further, Amoco argues that the Alexanders did not plead fraud.

 Under Count Two, paragraph 15 of the Alexander pleadings on which this case went to trial, the following allegation is set out:

The acts and omissions of Amoco, as alleged above, have been intentional, for the purpose of increasing Amoco's production from its upstructure leases. Amoco has pursued this course of conduct with conscious indifference to its damaging effect on Plaintiffs' royalty interest and therefore such acts and omissions have been malicious and wanton, for which Amoco should be assessed punitive or exemplary damages amounting to at least $3,916,658.

While the foregoing pleading does not specifically allege fraud, it does set forth averments which, if proven, would support an action in tort. Exemplary damages may be recovered for the tortious breach of a contract. Once the lessee's duty to protect the leased premises against drainage is fixed, there arises a duty of care and the negligent failure to perform the requirements set forth in the contract constitutes a tort. *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947).

 Testimony as to how Amoco operated the Alexander leases may be summarized as follows. John Alexander talked with various employees of Amoco, especially one Mr. Blocker, as early as 1969 about the declining production of oil from the subject leases. He explained to Mr. Blocker that other operators were "doing a better job of producing offset leases" and that he thought Mr. Blocker should do something. To this Mr. Blocker replied that "his engineers had spent a lot of hours in trying to figure out what to do and they didn't think they could do anything." Later in 1973, Mr. Alexander wrote a letter to Amoco explaining the dramatic drop in production from 9000 barrels to 1900 barrels per month during the past year. The letter further pointed out that Exxon improved production on offset leases in the same structural position as the Alexander leases. Amoco replied by letter stating that it had reviewed the wells on the lease and the economics did not justify the expenditures necessary to do corrective work and that it had been and intended to continue to produce the maximum oil rate during the life of the lease. The record shows that nothing was done to correct the drainage which Amoco knew was taking place. Expert testimony showed that an operator could have replaced the down-dip watered-out well with an up-dip well and could have reworked the existing wells at a handsome profit. Amoco's economic interests tied to its 80% field-wide leasehold ownership was adverse to the Alexanders' interests. The Alexanders owned a ⅛th royalty interest on both leases, whereas the royalty share on other Amoco leases was smaller. Amoco, by its majority ownership of the leases up-dip of the Alexander leases, would eventually recover a majority of the oil which was drained away from the Alexander leases. If Amoco gained 10 barrels of oil on the Alexander leases, it lost 8 barrels from its other capable wells in the field due to the total field allowable reallocation. Amoco's net field-wide gain was only 20% of the gain to the Alexanders' leases. Any time the expense exceeded 20% of the anticipated increase in lease production, it would not be economically worthwhile for Amoco to increase production on the Alexander leases. In the meantime, Amoco was increasing the

amount and rate of drainage from the Alexander leases by reworking some 23 up-dip wells and "plugging-back" some wells in the intermediate depths, all of which activity hastened the watering-out of the Alexander leases. Exxon, which was also located down-dip from Amoco, but not as low as the Alexanders, was compelled to seek and receive Rule 37 exceptions for replacement wells in order to stem the confiscation which the Railroad Commission found to be taking place. There is nothing in the record to show that Amoco offered to return these leases to the Alexanders, despite their low production. No other operator could work the leases as long as they were under Amoco's control.

We think that from the foregoing summary of the evidence, the jury could find, as it was instructed, that punitive or exemplary damages would be appropriate under the circumstances and that the foregoing conduct on the part of Amoco showed "such a conscious, deliberate disregard of the interest of others that defendants' conduct may be called malicious or wanton, or if that conduct includes the commission of a wrongful act for the purpose of injuring the property of another." *Pan American Petroleum Corp. v. Hardy*, 370 S.W.2d 904 (Tex.Civ.App.-Waco 1963, writ ref'd n. r. e.).

Amoco further complains that the amount of exemplary damages awarded by the jury was excessive. We find no merit to this contention and determine that the award is not excessive. As a general rule, the amount of exemplary damages should be reasonably proportional to the actual damages and may include compensation for inconvenience, reasonable attorneys' fees, and other losses too remote to be considered under actual damages. The nature of the wrong, the type of conduct involved, the degree of culpability of the wrongdoer, and the extent to which such conduct offends a public sense of justice and propriety, are among the factors which determine how much a jury may award for exemplary damages. Unless the award is so large as to be unreasonable under the particular facts of the case, the verdict of

the jury will not be disturbed on appeal. *Bond v. Duren*, 520 S.W.2d 460 (Tex.Civ. App.-Waco 1975, writ ref'd n. r. e.); *Cain v. Fontana*, 423 S.W.2d 134 (Tex.Civ.App.-San Antonio 1968, writ ref'd n. r. e.).

Amoco also argues that the trial court was in error for not allowing the jury to consider the 1940 lease agreements with the Alexanders in its deliberations on the issue of exemplary damages. Amoco claims that this refusal by the trial court had the effect of denying it the opportunity to argue to the jury that it in good faith believed that the agreements relieved it of the liability that the Alexanders were seeking to impose and that such an argument possibly could have prevented or mitigated the award of exemplary damages. The evidence shows, however, that Amoco's defense of its refusal to drill new wells or replace or rework existing wells on the Alexander leases was based on its pleadings that it was under no legal duty to perform any function upon the Alexander leases designed to prevent field-wide drainage. The basis of the Alexanders' suit is that the manner in which Amoco operated their leases resulted in the oil drainage losses for which they were entitled to actual and exemplary damages. The 1940 agreements had nothing to do with Amoco's method of operating the subject leases. In reference to what Amoco's policy was in performing remedial work, drilling replacement or new wells on the Alexander A and B leases, Amoco's counsel asked its witness, Jerry Brown, a division engineer manager, if his knowledge, based upon his investigation and the records, was ". . . that Amoco has treated the Alexanders just like they have all of the rest of their royalty owners in this field?" Mr. Brown replied, "Yes, sir." Amoco has not shown that it had any evidentiary basis for making a "good faith" argument to the jury by allowing the consideration of the agreements. We think the trial court gave the proper instruction in charging the jury not to consider the 1940 agreements in answering the special issues submitted. Points of error nine, ten and eleven are overruled.

By its twelfth point of error, Amoco contends that the trial court erred in failing to deduct the Alexanders' share of the occupation tax from the actual damages awarded.

We have before us a judgment for actual damages based on the ⅛th royalty value of the 1,592,348 barrels of oil found to have been drained away from the Alexander leases by Amoco. The jury determined the fair market value of the drained oil to be $1,958,329 for the Alexanders' ⅛th royalty portion. It is the Alexanders' theory that they were wrongfully deprived of this amount of oil and its value and that a prudent operator would have produced it for them. There is evidence that a majority of the oil drained from the Alexander leases was recovered up-dip by Amoco, which was required by art. 4.02, et seq. V.A.T.S. Tax.-Gen. (1969) and § 81.111(a) and (b) V.T.C.A., Tex.Nat.Resources (1978), to pay taxes on all oil produced. Section (6) of art. 4.03 provides that the tax "shall be borne ratably by all interested parties, including royalty interests." In *Sheppard v. Stanolind Oil & Gas Co.*, 125 S.W.2d 643, 648 (Tex.Civ.App.-Austin 1939, writ ref'd), the court observed:

> And this is so because the royalty owner's interest in production is such as to make him an interested party and a "producer" within the meaning of the statute. The tax being laid upon him it is payable out of his interest, and not by the lessee or owner of the working interest.

We hold that the Alexanders, as royalty owners, must pay their proportional share of the occupation tax and the additional tax as set out in § 81.111(a) and (b), supra. The trial court should have multiplied $1,958,329, the value of the Alexanders' ⅛th royalty interest by 4.6% as set out in art. 4.02. Their occupation tax is $90,083.13. The additional tax required under § 81.111(a) would be determined by multiplying the number of barrels of oil drained by ⅛th (the Alexanders' royalty share) and then multiplying this product by ³/16 cents. Their additional tax is $497.61. Thus the trial court should have deducted $90,580.74 from the $1,958,329, resulting in $1,867,748.26 as

the correct figure. We sustain Amoco's point of error number twelve.

In view of our disposition of all of the other points of error presented by Amoco, we overrule the cumulative point of error number thirteen.

The judgment of the trial court is reformed so as to reflect a $90,580.74 reduction for taxes due by the Alexanders, leaving the sum of the judgment $3,826,077.76. In all other respects the judgment is affirmed.