IN THE SUPREME COURT OF TEXAS













IN THE SUPREME COURT OF TEXAS

 

════════════

No. 05-0466

════════════

 

Coastal Oil & Gas
Corporation and Coastal Oil & Gas USA, L.P., Petitioners,

 

v.

 

Garza Energy Trust et al., Respondents

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Thirteenth District of
Texas

════════════════════════════════════════════════════

 

Argued September
28, 2006

 

 

            Justice Johnson, joined by Chief Justice Jefferson, and by Justice Medina as to Part I, concurring
in part and dissenting in part. 

 

 

            I join the Court’s opinion except
for Part II-B. As to Part II-B, I would not address whether the rule of capture
precludes damages when oil and gas is produced through hydraulic fractures that
extend across lease lines until it is determined whether hydraulically
fracturing across lease lines is a trespass. As to Part IV-A, I agree that
admission of the 1977 memorandum constituted error and was harmful, but I would
hold that a harm analysis is not necessary because admission of the memorandum
was incurable error.

I.
Rule of Capture

            The rule of capture precludes
liability for capturing oil or gas drained from a neighboring property
“whenever such flow occurs solely through the operation of natural agencies in
a normal manner, as distinguished from artificial means applied to stimulate
such a flow.” Peterson v. Grayce Oil Co., 37 S.W.2d 367, 370-71 (Tex.
Civ. App.—Fort Worth 1931), aff’d, 98 S.W.2d 781 (Tex. 1936). The rationale for the rule of
capture is the “fugitive nature” of hydrocarbons. Halbouty v. R.R. Comm’n,
357 S.W.2d 364 (Tex.
1962). They flow to places of lesser pressure and do not respect property
lines. The gas at issue here, however, did not migrate to Coastal’s well
because of naturally occurring pressure changes in the reservoir. If it had,
then I probably would agree that the rule of capture insulates Coastal from
liability. But the jury found that Coastal trespassed[1] by means of the hydraulic fracturing
process, and Coastal does not contest that finding here.[2] Rather, Coastal contends that a
subsurface trespass by hydraulic fracturing is not actionable. In the face of
this record and an uncontested finding that Coastal trespassed on Share 13 by
the manner in which it conducted operations on Share 12, I do not agree that
the rule of capture applies. Coastal did not legally recover the gas it drained
from Share 13 unless Coastal’s hydraulic fracture into Share 13 was not
illegal. Until the issue of trespass is addressed, Coastal’s fracture into
Share 13 must be considered an illegal trespass. I would not apply the rule to
a situation such as this in which a party effectively enters another’s lease
without consent, drains minerals by means of an artificially created channel or
device, and then “captures” the minerals on the trespasser’s lease. See id.
at 375 (limiting the rule of capture to oil and gas that is legally recovered);
see also SWEPI, L.P. v. Camden Res., Inc., 139 S.W.3d 332, 341 (Tex.
App.—San Antonio 2004, pet. denied).

            In considering the effects of the rule
of capture, the underlying premise is that a landowner owns the minerals,
including oil and gas, underneath his property. Elliff v. Texon Drilling Co.,
210 S.W.2d 558, 561 (Tex.
1948). In Halbouty, this Court succinctly harmonized this property rule
with the rule of capture:

 

To infer that the
rule of capture gives to the landowner the legally protected right to capture
the oil and gas underlying his neighbor’s tract is entirely inconsistent with
the ownership theory. To harmonize both rules, the rule of capture can mean
little more than that due to their fugitive nature, the hydrocarbons when
captured belong to the owner of the well to which they flowed, irrespective of
where they may have been in place originally, without liability to his neighbor
for drainage. That is to say that since the gas in a continuous reservoir will
flow to a point of low pressure the landowner is not restricted to the
particular gas that may underlie his property originally but is the owner of
all that which he may legally recover.

 

357 S.W.2d at
375 (emphasis added). Coastal concedes that gas must be legally produced in
order to come within the rule of capture. See also Elliff, 210 S.W.2d at
562-63 (“[E]ach owner of land in a common source of supply of oil and gas has
legal privileges as against other owners of land therein to take oil or gas
therefrom by lawful operations conducted on his own land.”) (emphasis
added) (citing 1 W.L. Summers, Oil and
Gas § 63 (Perm. ed.)); Commanche Duke Oil Co. v. Tex. Pac. Coal &
Oil Co., 298 S.W. 554, 559 (Tex. 1929) (“[O]ne owner could not properly
erect his structures, surface or underground, in whole or part beyond the
dividing line, and thereby take oil on or in the adjoining tract, or induce
that oil to come onto or into his tract, so as to become liable to capture
there or prevent the owner of the adjoining tract from enjoying the benefit of
such oil as might be in his land or as might come there except for these
structures.”). The key word is “legally.” Without it, the rule of capture
becomes only a license to obtain minerals in any manner, including unauthorized
deviated wells, and vacuum pumps and whatever other method oilfield operators
can devise.

            Today the Court says that because Salinas does not claim
the Coastal Fee No. 1 well violates a statute or regulation, the gas that
traveled through the artificially created and propped-open fractures from Share
13 to the well “simply does not belong to him.” But that conclusion does not
square with the underlying rationale for the rule of capture as we expressed it
in Halbouty, and as seems only logical and just: an operator such as
Coastal owns the oil and gas that is legally captured. See Halbouty,
357 S.W.2d at 375. And “legally” should not sanction all methods other than
those specifically prohibited by statute or rule of the Railroad Commission. It
simply cannot be a legal activity for one person to trespass on another’s
property. See Black’s Law
Dictionary 522 (7th ed. 1999) (defining “legal duty” as a “duty arising
by contract or by operation of law; an obligation the breach of which would be
a legal wrong [such as] the legal duty of parents to support their children”); Texas-Louisiana
Power Co. v. Webster, 91 S.W.2d 302, 306 (Tex. 1936) (noting that a
trespasser is one who enters upon the property of another without any right,
lawful authority, or express or implied invitation). The question the Court
does not answer, but which it logically must to decide this case, is whether it
was legal for Coastal to hydraulically fracture into Share 13. The answer to
the question requires us to address Coastal’s primary issue: does hydraulic
fracturing across lease lines constitute subsurface trespass.

            We have held that a trespass occurs
when a well begun on property where the operator has a right to drill is,
without permission, deviated so the well crosses into another’s lease. See
Hastings Oil Co. v. Tex. Co., 234 S.W.2d 389 (Tex. 1950). Coastal argues that there are
differences between taking minerals from another’s lease through fracturing and
taking them by means of a deviated well. Maybe there are, even though both
involve a lease operator’s intentional actions which result in inserting
foreign materials without permission into a second lease, draining minerals by
means of the foreign materials, and “capturing” the minerals on the first
lease. The question certainly is not foreclosed. See Gregg v.
Delhi-Taylor Oil Corp., 344 S.W.2d 411, 414 (Tex.
1961); Terry D. Ragsdale, Hydraulic Fracturing: The Stealthy Subsurface
Trespass, 28 Tulsa L. J. 311, 339 (1993) (noting that
“[f]rom both a functional and physical perspective, a hydraulic fracture is
largely analogous to a directionally drilled well”). In Gregg, 344
S.W.2d at 414-15, we suggested that sand fracturing may constitute a trespass,
and in Railroad Commission of Texas v. Manziel, 361 S.W.2d 560, 567 (Tex. 1962), we implied
that subsurface trespasses are not different from other trespasses. 

            To differentiate between a deviated
well and a fractured well, the Court says that gas extracted from a neighboring
lease through a deviated well is not subject to the rule of capture for two
reasons: the neighbor cannot protect from such drainage by drilling a well, and
there is no uncertainty that the deviated well is producing another owner’s
gas. I fail to follow the Court’s logic. As to the first reason, the neighbor
can protect from either a fracture extending into the neighbor’s property or a
deviated well. Both simply provide the means for gas to flow to an area of
lower pressure and from there to the drilling operator’s property where it is
captured. The only difference is the degree of drainage that can be prevented
by offset wells, and a fracture’s exposure to the reservoir may be greater than
that of the deviated well and thus drain more gas. As to the second reason, the
purpose of both a deviated well and a hydraulic fracture is for gas to flow
through them to be gathered at a distant surface. Coastal fractured its well so
gas would flow through the fractures to the wellbore, and no one contends that
gas did not do so. The evidence showed that the effective length of a fracture
can be fairly closely determined after the fracture operation. Coastal’s expert
testified that the effective length of the fractures (that length through which
gas will flow) did not extend into Share 13, while Salinas’s expert opined that it did. As in
most trials, the jury was called upon to resolve the conflicts in testimony. It
resolved them in favor of Salinas.
In sum, the jury decided that part of the gas produced from Coastal Fee No. 1
was a result of the channel created by Coastal’s fracturing into Share 13.
There was evidence to support the finding.

            The Court gives four reasons “not to
change the rule of capture” to allow a cause of action for drainage accomplished
by hydraulic fracturing beyond lease lines. I disagree with some of the four
reasons,[3]
but my fundamental disagreement is not with the reasons the Court gives. My
fundamental disagreement is with the Court’s premise that its decision is not
a change of the rule of capture. I believe the Court is changing the rule,
and I would not do so.

            The Court says that mineral owners
and lessors aggrieved by drainage because of hydraulic fracturing have numerous
alternative remedies such as self help, suits against their lessee, offers to
pool, and forced pooling. That is true in many cases, as witnessed by the amici
briefs. But not all property owners in Texas
are knowledgeable enough or have the resources to benefit from those remedies.
The rules of ownership and capture apply to them, also. Amici and the Court
reference the importance of hydraulic fracturing to development of the Barnett
shale field and other mineral interests in Texas. Who could quarrel with the facts? But
those reports in many instances refer to mineral leasing and royalty payment
benefits being received by small property owners, in many cases so small as to
be single-family residence owners. Today’s holding reduces incentives for
operators to lease from small property owners because they can drill and
hydraulically fracture to “capture” minerals from unleased and unpooled
properties that would otherwise not be captured. Today’s holding effectively
allows a lessee to change and expand the boundary lines of its lease by
unilateral decision and action—fracturing its wells—as opposed to contracting
for new lease lines, offering to pool or utilizing forced pooling, or paying
compensatory royalties. Such a situation is exemplified by the facts facing
this Court in Gregg. 344 S.W.2d 411. Gregg had a small lease surrounded
by mineral interests owned by Delhi-Taylor. Id. at 412. Gregg planned to “expand”
his lease by fracing a well and recovering minerals that he would not have been
able to recover otherwise because of the tight gas formation. Id. The problem was that he was going
to be recovering some of the minerals from Delhi-Taylor’s part of the
reservoir. Id.
We did not have difficulty recognizing that Gregg’s fracing into Delhi-Taylor’s
minerals, if it occurred, potentially was a trespass that the courts could
enjoin. Id.
at 416.

            Additionally, not all property
owners in Texas
may benefit from the remedies the Court mentions. For example, the Court
references the Mineral Interest Pooling Act, and says that if an owner’s offer
to pool is rejected, the owner may apply to the Railroad Commission for forced
pooling. See Tex. Nat. Res. Code
§§ 102.001-.112. But it is not clear that royalty owners such as Salinas can do so. See
id. § 102.012; R.R. Comm’n of Tex. v. Coleman, 460 S.W.2d 404 (Tex. 1970) (interpreting
predecessor statute). 

            The Court, Coastal, and amici
reference the importance of hydraulic fracturing to the development of mineral
interests in Texas,
and raise valid concerns about the effect on mineral production if hydraulic
fracturing subjects the fracturing operator to exemplary damages.[4] Just as a clean slate is not presented as
to whether the rule of capture applies here, we do not have a clean slate in
regard to mineral recovery operations and related considerations. In Manziel,
this Court considered the legitimacy of salt water injection recovery
operations authorized by the Railroad Commission. 361 S.W.2d 560. The public
policy pronouncements set out in Manziel are applicable to techniques,
such as hydraulic fracturing, that allow for more efficient and fuller recovery
of diminishing mineral resources:

 

The orthodox rules
and principles applied by the courts as regards surface invasions of land may
not be appropriately applied to subsurface invasions as arise out of the
secondary recovery of natural resources. If the intrusions of salt water are to
be regarded as trespassory in character, then under common notions of surface
invasions, the justifying public policy considerations behind secondary
recovery operations could not be reached in considering the validity and
reasonableness of such operations. See: Keeton and Jones: ‘Tort Liability and
the Oil and Gas Industry II,’ 39 Tex.
Law Rev. 253 at p. 268. Certainly, it is relevant to consider and
weigh the interests of society and the oil and gas industry as a whole against
the interests of the individual operator who is damaged; and if the authorized
activities in an adjoining secondary recovery unit are found to be based on
some substantial, justifying occasion, then this court should sustain their
validity.

 

361 S.W.2d at
568 (emphasis added).

            The Legislature has made it the
policy of this state to encourage secondary recovery of minerals, Manziel,
361 S.W.2d at 570, and has declared that waste in the production of oil and gas
is unlawful. Tex. Nat. Res. Code
§§ 85.045, 86.011. Waste includes “physical waste or loss incident to or
resulting from drilling, equipping, locating, spacing, or operating a well or
wells in a manner that reduces or tends to reduce the total ultimate recovery
of oil or gas from any pool.” Id.
§ 85.046(6). See also id. § 86.012(5).

            Courts have long protected the
interests of mineral lessors by imposing duties on lessees in regard to
protection and development of leases. Grubb v. McAfee, 212 S.W. 464, 465
(Tex. 1919).
Technology and the leasing process have developed through the years, but the
law continues to support the goals of mineral lessors and society. It does so,
in part, by implying covenants in leases that enhance exploration for and
recovery of minerals and protect lessors’ goals in executing leases.[5] Amoco Prod. Co. v. Alexander, 622
S.W.2d 563, 567 (Tex.
1981). One such duty of lessees encompassed within the covenant to manage and
administer the lease is a duty to use modern methods of production. See id.
n.1. Manifestly, this is an area in which policy decisions predominate and in
which the Legislature and Railroad Commission have the resources and expertise
to provide rules and adjust equities among the various interests. Nevertheless,
the law is flexible enough to balance the interests of society as to energy
availability, the inability of producers to recover certain minerals in an
economically viable manner absent use of methods such as hydraulic fracturing
and the rights of individual mineral owners. See Gutierrez v. Collins,
583 S.W.2d 312, 317 (Tex. 1979) (noting that the genius of the common law lies
in its ability to recognize when a rule needs to be modified to better serve
the needs of society). Even if it were to be decided that hydraulic fracturing
is subject to traditional trespass rules, equitable considerations are proper
in determining the availability of damages for trespass related to the recovery
of minerals, just as equitable considerations resulted in implied covenants
protecting and promoting goals of mineral leases and lessors. See Bender v.
Brooks, 127 S.W. 168, 170-71 (Tex.
1910) (“The controversy arises over the method by which the rights of the
parties shall be adjusted . . . . The law will determine the rights of the
parties, but equity will adjust the account between them.”); Hunt v. HNG Oil
Co., 791 S.W.2d 191, 193 (Tex. App.—Corpus Christi 1990, writ denied).

            In balancing the interests involved
here, it seems that even if hydraulic fracturing is subject to trespass law,
precluding recovery of exemplary damages for a trespass through a
hydraulic fracture could be deemed reasonable. For example, the testimony in
this case reveals that although the fracture length of an operation can be
estimated before the job is done, the effective length—the length of the
fracture through which gas will flow—cannot. Because there are clearly
difficulties and technological limitations in these expensive but necessary
operations, the law should be flexible in considering them. Preclusion of
exemplary damages would be one way to minimize discouraging the use of advances
in technology and recovery techniques, yet leave in place protection for rights
of individual mineral owners to their property. A possible consideration for
precluding exemplary damages if hydraulic fracturing were subject to trespass
law could be the defense that, in light of industry standards at the time, a
reasonably prudent lessee could have believed the fracturing operation was
necessary to economically recover the minerals from the lessee’s estate. 

            Whatever the result, I would decide
the trespass issue.

II.
The 1977 Memorandum

            Turning to the 1977 memorandum,
Coastal moved for its exclusion prior to trial in a separate trial brief as
well as during trial, yet the trial court admitted it. The offensive sentence
referencing “illiterate Mexicans,” along with most of the rest of the
memorandum, was read to the jury when Salinas’s
counsel examined Coastal’s corporate representative. The memorandum was
discussed again when Salinas’s
counsel asked plaintiff Margarito Salinas how the language of the memorandum
made him feel. He testified that he and his other family members felt infuriated
and insulted when they saw it because it insulted his ancestors. The court then
granted Salinas’s
counsel’s request to publish the exhibit to the jury.

            The memorandum came up again in
closing argument. As set out in the Court’s opinion, Coastal’s counsel argued
that it was an attempt to inflame the jury: “They figure that if they can get
you angry enough, then you are going to throw sound judgment out the window and
that your decisions will be based on sentiment and not on reason.” Coastal’s
argument on the issue clearly was an attempt to defuse the problem created by
the offensive evidence and testimony.

            Texas Rule of Evidence 403 states:
“Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay, or
needless presentation of cumulative evidence.” Balancing the probative value of
the evidence against the risk of unfair prejudice, like other evidentiary
rulings, is left to the trial court’s discretion. See Tex.
Dep’t of Transp. v. Able, 35 S.W.3d 608, 617 (Tex. 2000). In this instance, the
inflammatory nature of the language was apparent and had no relevance to any
issue being tried.

            Salinas focuses on the relevance of the
document to land title issues. Salinas also
claims that the document was not unfairly prejudicial to Coastal, the cases
Coastal cites are irrelevant because they concern jury arguments, and it was
Coastal, not Salinas,
that made a plea for racial unity. I am not persuaded.

            The attorneys who prepared and tried
this case were probably in the best position to predict the memorandum’s
inflammatory effect on the jury. We have recognized that one method of measuring
the prejudicial impact of evidence is to consider “the efforts made by counsel
to emphasize the erroneous evidence.” Nissan Motor Co. Ltd. v. Armstrong,
145 S.W.3d 131, 144 (Tex.
2004). The extent and intensity of opposing counsel’s attempts to exclude the
evidence, and failing exclusion, to neutralize its effects, should also be
considered. Id.
Coastal’s attorneys saw the potential effect of the offensive language and
tried on multiple occasions to exclude it from evidence. Salinas’s counsel, on the other hand, never
offered the memorandum without the offensive language and made sure that the
memorandum was woven into the fabric of the trial. Further, although Salinas’s attorney did
not mention the memorandum’s offensive language in his argument, one of
Coastal’s two attorneys who gave closing argument devoted his entire argument
to the memorandum in a clear attempt to diminish its effect. Coastal’s attorney
referenced “gringos,” stated that he was offended by the term “illiterate
Mexicans,” and spoke in Spanish to the jury when arguing that the jury should
not accept Salinas’s
invitation “to throw sound judgment out the window.” Salinas’s counsel then addressed the memo in
rebuttal argument with a less-than-subtle ethnicity-based appeal to the all-Hispanic
jury:

 

Yeah, maybe at one
time we were people of the land. But, you know, some of these people got
educated. They learned how to read. They learned how to write. And the—you
know, the thing about that memo is that it shows the attitude, the attitude on
the part of the corporation. If you’ll notice, the corporation did not bring in
one person that received the memo, did not bring in the author of the memo to
tell us what he really meant. No, they rely on some of these paid experts like
Rick Garza who got paid 50,000 to prepare a map, or some of the lawyers that
have nothing to do with this who are now coming in trying to explain something
for this $10-billion corporation that didn’t care enough to bring in the person
that actually wrote the memo or received the memo so they can tell you what
they really meant. Why are they referring to a — 1977 to illiterate
Mexicans? Why not just call them owners of the land, owners of the royalty
interest?

 

(emphasis
added).

            Paraphrasing what we said in General
Motors Corp. v. Iracheta, 161 S.W.3d 462, 472 (Tex. 2005), the harm of this evidence is
manifest. The memorandum was intended to and did inject racial prejudice into
the trial. The question we are bound to address related to our system of
justice is how to best minimize the number of cases that appear to be or are
tried under the cloud of mistrust that admission of this type of evidence
engenders. One commentator has addressed the problem as follows:

 

            It is important to recognize that
rejection of race, religion and sex as classifications in rulings on relevance
is not based entirely on the notion that there can be no logical distinctions
resting on these bases; instead, it rests on the belief that in a
multi-cultural society like ours, fairness in adjudication does not consist
entirely in the accuracy of the factual determinations but may require some
sacrifice of accuracy to avoid the suspicion that the decision rests on
prejudice disguised as science. . . . Trial judges can expect much less leeway
in appellate review of relevance rulings that involve such classifications.

 

Charles Alan Wright & Kenneth W. Graham,
Jr., Federal Practice & Procedure § 5179 (1978).

            This Court has long recognized that
it is not acceptable advocacy to attempt to inflame the jury with irrelevant
evidence of or reference to such “hot-button” matters as sex, race, ethnicity,
nationality, or religion. Texas courts have not hesitated to treat such
irrelevant evidence and comments as incurable error. See Standard
Fire Ins. Co. v. Reese, 584 S.W.2d 835, 840 (Tex. 1979) (“The injection of
new and inflammatory matters into the case through argument has in exceptional
cases been regarded as incurable by an instruction. An appeal to racial
prejudice falls into the category.”); Tex. Employers’ Ins. Ass’n v. Haywood,
266 S.W.2d 856, 858 (Tex. 1954) (holding that although inflammatory argument is
usually regarded as “curable,” racist argument “was so inflammatory and
prejudicial that its harmfulness could not have been eliminated by either retraction
or instruction”); Tex. Employers’ Ins. Ass’n v. Guerrero, 800 S.W.2d
859, 863 (Tex. App.—San Antonio 1990, writ denied) (“[I]ncurable reversible
error occurs whenever any attorney suggests, either openly or with subtlety and
finesse, that a jury feel solidarity with or animus toward a litigant or a
witness because of race or ethnicity.”); Penate v. Berry, 348 S.W.2d
167, 168-69 (Tex. Civ. App.—El Paso 1961, writ ref’d n.r.e.) (finding that
argument appealing to nationality prejudice was incurable error); Tex.
Employers’ Ins. Ass’n v. Jones, 361 S.W.2d 725, 727 (Tex. Civ. App.—Waco
1962, writ ref’d n.r.e.) (prejudicial argument referring to religion of witness
was incurable error); Basanez v. Union Bus Lines, 132 S.W.2d 432, 432-33
(Tex. Civ. App.—San Antonio 1939, no writ) (stating that comments that
plaintiffs were Mexicans and defendant was “one of our citizens” were
reversible error).

            We recently held, in the context of
jury argument, that some matters are not subject to harmless error analysis because
they strike “at the appearance of and the actual impartiality, equality, and
fairness of justice rendered by courts.” Living Ctrs. of Tex., Inc. v.
Peñalver, 256 S.W.3d 678, 681 (Tex. 2008). We held that such matters are
“incurably harmful not only because of [their] harm to the litigants involved,
but also because of [their] capacity to damage the judicial system.” Id.
We gave, as the paradigm example of such incurable error, “appeals to racial
prejudice [that] adversely affect the fairness and equality of justice rendered
by courts because they improperly induce consideration of a party’s race to be
used as a factor in the jury’s decision.” Id. I would apply the same
analysis where appeal to racial prejudice is made though admission of
documentary evidence. And, I would hold that pleas for ethnic solidarity or
racial prejudice are unacceptable even when not made in explicit terms. See
Freedom Newspapers of Tex. v. Cantu, 168 S.W.3d 847, 857 (2005).

            In this case, the offensive language
could have been redacted. While a redaction probably would have drawn jurors’
attention to the redaction and might have caused confusion or
misinterpretation, redactions or other methods of screening irrelevant and
passion-inducing evidence are better than allowing admission of evidence that
distorts the fact-finding process. The term “illiterate Mexicans” may have been
one of historical fact rather than a racial slur. But even if the words were
originally intended to be only historical fact, at the present time the phrase
undoubtedly induces strong feelings along racial lines. And as to the argument
that Coastal did not object timely to Margarito Salinas’s testimony about how
the memorandum made him and his family feel, a major part of the damage would
have been accomplished by the mere asking of the question and Coastal’s making
an objection. An objection would have highlighted the language as well as the
fact that Coastal recognized its offensive nature.

            Salinas has not claimed that the
offensive phrase was relevant to an issue regarding race, such as
discrimination, or that Coastal’s damage causing actions were racially
motivated. The trial court or Salinas’s lawyers could have found some way to
introduce the contents of the memorandum without introducing the racially oriented
language if they truly felt the memorandum’s contents were relevant for some
purpose other than arousing racial prejudice. For example, they could have
redacted the offensive language, or read the memorandum’s contents into the
record minus the offending language. Admitting the memorandum in its entirety
made all its contents part of the trial. It was used to examine witnesses, was
published to the jury, was available for counsel to reference during trial and
jury argument, and was available for the jurors to review during their
deliberations.

            I would hold that a harm analysis is
unnecessary. Intentional introduction of evidence such as the memorandum with
its offending phrase affects not only the particular case in which it is
admitted, but also sets a precedent and strikes at the appearance of and actual
impartiality, equality, and fairness of justice rendered in our judicial
system. I would hold that admission of the memorandum requires reversal and
remand for a new trial without conducting a harm analysis. See Living Ctrs.,
256 S.W.3d at 680-81.

            I would not hold that the rule of
capture applies to gas produced from Share 13 by means of the hydraulic
fracture. I would not render judgment for Coastal on the trespass claim based
on the rule of capture and would consider Coastal’s issue as to whether
hydraulic fracturing can constitute a subsurface trespass. I agree that the
1977 memorandum requires the case to be reversed. Otherwise, I join the Court’s
opinion and agree that the case must be remanded for a new trial.

 

 

                                                                        ________________________________________

                                                                        Phil
Johnson

                                                                        Justice

 

OPINION DELIVERED: August 29, 2008


















[1] See
Laura H. Burney & Norman J. Hyne, Hydraulic Fracturing: Stimulating Your
Well or Trespassing?,
44 Rocky Mtn. Min. L. Inst. 19-1,
19-45 (1998) (“Under both common law and modern definitions, a trespass occurs
if a ‘thing’ physically crosses property boundaries. . . . [T]his definition is
satisfied when fracing extends beyond lease or unit lines.”).





[2]
As the Court notes, Coastal drilled the Coastal Fee No. 1 approximately 467
feet from the lease lines to the north and east. That made the well less than 700
feet from the lease lines north of the well through those east of it. Coastal
knew it was going to hydraulically fracture the well because all the wells
producing from the Vicksburg T were fracture-treated. The fracture operation on
the well was designed to cause fractures to extend over 1000 feet from the well
and force proppant into them to keep them open. There was disagreement as to
whether the effective length of the fractures extended into Share 13. The jury
resolved that in favor of Salinas.





[3]
The Court also says that proving the value of oil and gas drained by hydraulic
fracturing deep under the ground is difficult. But similarly, proving the value
of damages from breach of the implied covenant to protect from drainage
requires expert testimony about a hypothetical well that should have been
drilled to protect the lease, and calculation of the hypothetical effects that
hypothetically would have taken place deep underground. See Kerr-McGee Corp.
v. Helton, 133 S.W.3d 245, 254 (Tex. 2004). Difficulty in proving matters
is not a new problem to trial lawyers. Besides, Coastal does not mount an
evidentiary challenge to the jury findings.





[4]
Amici uniformly predict dire consequences if hydraulic fracturing of wells is
subject to trespass liability standards. No brief offers support for the
position that fracturing will affect drilling anywhere but in close proximity
to lease lines. The briefs do not offer actual numbers, statistics, or even
“educated guesses” directed to how many wells or locations would be affected.





[5]
One commentator has categorized the major implied covenants as follows:

 

                   
(A) Implied covenants to develop the leases.

                   
(1) To drill an initial well.

                   
(2) To reasonably develop the lease after production has been acquired.

                   
(B) Implied covenants of protection.

                   
(1) To protect against drainage.

                   
(2) Not to depreciate the lessor’s interest.

                   
(C) Implied covenants relating to management and administration of the lease.

                   
(1) To produce and market.

                   
(2) To operate with reasonable care.

                   
(3) To use successful modern methods of production and development.

                   
(4) To seek favorable administration action.

 

R. Hemingway, The Law of Oil
and Gas § 8.1 (1971).